THE FIRST NATIONAL BANK OF DENVER, APPELLANT, v. CAMPBELL, APPELLEE.

1. PRACTICE.
No relief ought to be granted on a case other than the one laid by the pleadings.
2. EVIDENCE—RESULTING TRUST.
Parol evidence is competent to prove a resulting trust.   Such a trust must result, if at all, at the instant the deed is taken, and the legal title vests in the grantee.
3. PROOF, QUANTUM OF.
Unquestionable evidence is required to establish a resulting trust. Whatever is essential to exhibit the equity of the *cestui que trust* must appear in a clear and unclouded light.
4. TRUST DOES NOT RESULT, WHEN.
No trust can ever result to a grantor when his conveyance is made for a colorable, illegal or fraudulent purpose.
5. ATTACHING CREDITOR, RIGHTS OF.
A creditor who causes an attachment to be levied on real estate, without notice of an unrecorded deed by the debtor, is entitled to all the protection afforded an innocent purchaser for value.

| 2 | 271 |
| 2 | 579 |
| 19c | 127 |
| 2 | 271 |
| 7 | 108 |
| s22c | 180 |
| 2 | 271 |
| 8 | 202 |

*Appeal from the District Court of Arapahoe County.*

IN 1878 Albert J. Johnson, Tipton, Obey and Porterfield discovered and located the "Sierra Nevada" lode.   Johnson

became the owner of a quarter interest in the claim. This interest remained in Johnson until the 6th of August, 1883, when he deeded it to Peter Campbell, William's brother. This deed was procured to be executed by William Campbell to deprive the federal court of its jurisdiction of a pending litigation with the iron mine. According to his testimony the deed was without consideration. On the 1st of September, 1884, Peter Campbell, by William Campbell his attorney in fact, re-deeded the property to Johnson, to whom, on the 15th of March, 1885, the government issued its patent. Johnson held the title until the 7th of December, 1885, when he executed a deed of this interest to William L. Campbell, which was not recorded until the 13th of September, 1886, nine days after the levy of the attachment in this suit.

February 23, 1883, Johnson made his promissory note to the order of the First National Bank of Denver for $9,442.10, payable on demand at that bank with interest from date. On the 3d of September, 1886, the bank brought suit against Johnson, and in aid of it sued out an attachment which was levied on the "Sierra Nevada" lode, in California mining district, Lake county. Subsequent to the institution of the suit Johnson died and his administrator was substituted, and the widow and heir at law was made a party. In 1888, William L. Campbell the administrator and the appellee in the present suit intervened, claiming title to the interests which had been seized under the writ.

Messrs. WOLCOTT and VAILE, and Mr. C. J. HUGHES, for appellant.

Messrs. PATTERSON & THOMAS and Mr. CHARLES HART-ZELL, for appellee.

BISSELL, J., after stating the case, delivered the opinion of the court.

The whole controversy is as to the priority of the lien obtained by the writ of attachment over the unrecorded deed

made by Johnson to Campbell. To clearly understand the case a somewhat full reference must be made to the testimony. There is a great discrepancy between the allegations of the petition of intervention, the evidence of the intervenor, and the findings of the court. According to the petition "it was expressly agreed between the said Albert Johnson and the petitioner at and before the time of the location of such claim that the interest in the said mining claims should be located in the name of Albert Johnson, but was and should be the property of and belonging to your petitioner." This averment was not supported by proof. Mr. Campbell's testimony substantially was: "Johnson was my agent in 1879. There were no written terms between us. There were no verbal terms. I just furnished him what money he used, and he went around the country from one camp to another as my agent. Q. Were you to take all he got? A. There was no agreement about that; of course if there was any money made I expected to give Albert part of it; what part was not stated. It was to come to me first and I was to make the division. There was no understanding between us, but that was the way we did. It is probable he was active around the property at the time of its location. Q. Did you know he took it in his own name? A. Yes, sir. Q. Was it at your request? A. I don't know as it was. I told him I did not want anything in my name." Campbell testified that he substantially paid all the expenses of the location and development of the property, including the purchase price paid to the government. He states, however, that Johnson may have paid a few dollars, but nothing of any account. Whatever may be the fact concerning the advancement of money to Johnson, it is not shown by Campbell's testimony, or by any other, that the money was devoted to the purposes for which it was supplied. In answer to a question by the court this appears: "Let me ask you a question right there, General Campbell. In the payment of this money for the patenting of the location, for the development, the assessment and the location, did you pay the money yourself to the parties to whom it was

due and payable on account of the work, the assessment and expenses, or did you give it to your partner Mr. Johnson, the defendant, to be paid, and was it paid through his hands?" A. "Well, I think partly one way and partly the other." The court: "In other words, did you yourself deal with the men who did the prospecting work, did you deal with the lawyers and others who incurred the expenses of the litigation, yourself?" A. "I dealt altogether with the lawyers; paid them entirely, and in the other instances, sometimes I paid them, and sometimes I gave him the money to pay." Campbell testified that they had a good many deals together and that from one of them there was in 1880 a profit realized of upwards of $30,000, of which Johnson got 50 per cent. He conceded that there was no sort of an agreement between him and Johnson as to what Johnson should receive for what he did, but that he would have received something out of any profits resulting from the enterprise. The court in its findings neither adopts the averments of the petition nor follows the only witness who testified on the subject. The court finds that Campbell advanced the money by which the mine was located and developed; and that the location was made in the name of Johnson "at the suggestion of said intervenor." It will be observed that these two findings neither make the location in Johnson's name the result of an express agreement between Johnson and Campbell prior to the discovery, nor does it make the location by Johnson one made by him as a representative of Campbell.

The conveyances from Johnson to Peter Campbell, from Peter back to Johnson, and from Johnson to William Campbell are shown by William's testimony and found by the court to have been voluntary conveyances without any consideration, and made with the knowledge and consent of William Campbell.

The court finds that at the time of the levy of the writ the bank, which is the appellant, had no notice whatever of the existence or the execution of the deed from Johnson to William Campbell; it further finds that the bank had notice

that the intervenor, William Campbell, had or claimed to have
some interest in the mining property, "and had the means
and opportunity of inquiring of the intervenor for definite
information in respect thereto before making the said levy."
The evidence in respect to the notice and the knowledge is
substantially as follows: In December, 1883, William Camp-
bell sold D. H. Moffat the "Louisville" mining claim, situ-
ate in Lake county.   It was shown that Mr. Moffat was then
the president of the First National bank of Denver, the
plaintiff in this suit.   About the time of the Louisville sale
Campbell testifies to a conversation which he had with Moffat,
wherein he tried to sell him his interest in the Sierra Nevada
lode.   As he puts it: "Q.  Now state what the conversation
with reference to the Sierra Nevada interest was between
yourself and Mr. Moffat.   A. Well it was some little time
after that I went to Mr. Moffat and tried to sell him my
quarter interest in the Sierra Nevada mine.   Q. How long
after?   A.  Well, I cannot tell you exactly, I talked with
him two or three times about it and wanted to sell it to him.
Q.  At or about that time I will ask you if you had a conver-
sation with Mr. Moffat or with Mr. Chaffee in Mr. Moffat's
presence concerning this Nevada claim?   A.  No.  I had a
conversation with him previous to that.   Q.  How long pre-
vious?  A. I think the conversation with Mr. Chaffee at which
Mr. Moffat was present happened in the latter part of 1885.
Q.  Where was it?   A.  It was in Mr. Chaffee's and Mr. Mof-
fat's room in Denver."   In regard to the latter conversation
it may be stated that it was one between William Campbell
and Mr. Chaffee during negotiations between them for a lease
on the property, and that Moffat's knowledge, if any, came
from overhearing the conversation which transpired in a room
then occupied by all the parties.   The dealings, whatever
they were which Campbell had with Moffat, were with him
individually, and if anything, were offers to sell his interest
in the Sierra Nevada mine, and nothing whatever was said
in any of the conversations as to the status of the title, or
the name in which it stood.   The only other evidence on the

subject of notice to the bank was that given by Peter Campbell, the brother of the intervenor, who testifies that in the latter part of 1883, while the Louisville negotiations were pending, he asked Moffat if he was going to buy Will's interest in the Sierra Nevada mine.   Peter states that in the course of that conversation he told Moffat that Johnson had no interest in it, and that William owned a quarter of the property.   This seems to have been a casual conversation, and it was not had in the transaction of any business in which the bank had any interest, and seems not to have occurred during the pendency of any negotiations with reference to the disposition of the Sierra Nevada claim, or any part of it. There was no other evidence on the subject of notice material to that inquiry.

To establish William Campbell's interest in the claim it was necessary for him to prove the payment of the money to Johnson for the location and development of the property. An agreement between William Campbell and Johnson with reference to the location of the Sierra Nevada mine was never proven.   There was no evidence as to the exact terms of any contract between Johnson and Campbell made before the location of the mine.   Campbell states Johnson was his agent, going about from one camp to another; but the provisions of the agency are not given, nor is it settled by Campbell's testimony what it was.   To establish his title to the interest levied on, he gives evidence that he advanced all the money which Johnson used from 1878 up to 1880, and that he substantially paid all the expenses of working the Sierra Nevada. Johnson does not appear to have been exclusively occupied as Campbell's agent.   He was interested with and for other parties, and at various times was shown to have been in possession of considerable money.   According to Johnson's own statements which were proven by the intervenor, the interest in the Sierra Nevada mine which he had located was not the sole property of Campbell, but was jointly owned by both those parties.   The payments which were made prior to 1882 are not clearly established.   It was undoubtedly proven by

Mr. Campbell that he furnished Johnson money when he went to Leadville, and furnished him money from time to time thereafter during the time the work was going on at the location. It was not clearly shown that the money which he gave Johnson went into the property. What disposition Johnson may have made of the funds furnished him by Campbell is largely a matter of conjecture.

The court below held that the deed by Johnson to Campbell was a valid conveyance, and that when the bank levied its writ it might have learned from the intervenor the situation of the title and that therefore it was chargeable with notice of the unrecorded deed and took nothing by the levy. The attachment was dissolved and judgment was entered in favor of the intervenor.

This somewhat complex history clearly outlines the three propositions which must be considered and determined.

First: What title was acquired by Albert Johnson when he located the "Sierra Nevada" lode, and was his title affected by any trust or equitable right in favor of the intervenor Campbell.

Second: If it be demonstrated or conceded, *ex gratia*, that Johnson held the interest charged with an equitable obligation in favor of Campbell, was it discharged of the relation as to the attaching creditor by the subsequent acts of transfer between Johnson, Peter Campbell and William, his brother.

Third: Was the bank legally chargeable with notice of the unrecorded deed from Johnson to William Campbell, or, if without notice, was it possessed of information which would have led to knowledge if due credit had been given it.

The Sierra Nevada mine was located in September, 1879, by Obey, Tipton and Johnson. The location certificate appears to have been filed on the 10th of September, and to have been followed by sundry conveyances between the various locators whereby Johnson's ultimate interest in the property according to the record was one fourth. These are the only facts concerning the title which can be said to be free

from obscurity. No evidence was offered tending to show the circumstances of the performance of the work antecedent to the location, nor in what manner, and by what persons, the subsequent development was done. It is certain that the intervenor was not present at the location, and that he had nothing whatever to do with the supervision of the subsequent work. The locators, Obey, Tipton and Johnson were present and attended to all these matters for several years. These proofs would place an unincumbered title to a one fourth interest in the claim in Albert Johnson. The important inquiry is whether he held the title for the benefit of William L. Campbell and charged with a trust in his favor which the law would enforce as against these attaching creditors.

The equitable interest which the intervenor relies on to support his title against the attachment cannot be upheld. In whatever aspect the case is viewed it lacks some of the essential elements which must always be present to support such a claim.

The averments of the bill respecting the agency are wholly unsupported by the proofs, and the evidence will not uphold the theory of a resulting trust. The intervenor is necessarily thrown back upon his rights under the unrecorded deed from Johnson. His claim under that deed is wholly dependent on the law of notice, and on what the testimony discloses to that point. A very slight reference to the allegations of the pleading filed by Campbell and to the proofs he offered will serve to show the complete departure in the supporting testimony from the case as laid. It was charged that whatever Johnson did was under the express agreement between Johnson and Campbell that the interest " in the mining claim should be located in the name of Albert J. Johnson, but was and should be the property of and belonging to your petitioner." No other significance can be given to this averment than what must always attach to an allegation of an express contract. It is indifferent whether the agreement rest in parol, or is preserved in apt writings which

express the conceded terms of the convention. In either event a definite, determinate, fixed and provable contract must be understood as the expression of the plea. When the case is presented on the trial, it transpires that there was no agreement of any sort. Campbell testifies that he furnished money before, after, and during the time when, as he says, " Johnson was his agent." These statements that Johnson was an agent cannot be taken to define the relation held by Johnson the locator. Whether one is the agent of another cannot be made to depend on the naked declarations of a principal that the other sustained to him that relation. It is a legal deduction to be drawn from competent proof of facts warranting the legal inference. It is clear from this short statement and the evidence before recited that the plea was not sustained by the case. On well settled rules of practice no relief ought to have been granted on a case other than the one laid : *Ford v. Loomis et al.*, 33 Mich. 121.

If a complete departure from such a well settled rule ought to be permitted when a judgment has been entered which is in complete and evident harmony with the rights and equities of the parties, the present case furnishes no foundation which warrants the deviation. There was no express contract between Johnson and Campbell out of which a trust could spring, and by which it was competently proved. None can be said to result from the relation which Johnson and Campbell held to each other, and from what was done by both or either.

The notion of an express trust which our statute requires to be evidenced and proved by a writing can be discarded. What comes under the well recognized and established idea of a resulting trust is alone to be considered. The statute has been so often evaded by judicial construction that this doctrine must be taken as incorporated into the enactment. Nothing is left save to require that what may be called the judicial requisites be present in all their exactness and to their full decided extent.

The familiar illustration of the purchase of property for

the benefit, and with the money of one, while the convey-
ance of the legal estate is taken in the name of another, fur-
nishes the supposed precedent for the present recovery. In
such a case a trust is said to arise by operation of law, and
the result is to vest the estate in the party in whose favor
the trust is implied. The principle is that the estate is held
to belong to him whose money paid for it. Since the nomi-
nal grantee parted with none of the consideration and in-
curred no liability concerning it, he is, as has been well said,
"looked upon and in truth is the mere conduit, pipe or chan-
nel through which the estate and the title and interest in it
pass from the grantor to the real purchaser who pays the
consideration for it." These trusts do not come within the
prohibition of that statute which declares that trusts con-
cerning lands shall not be created unless by an instrument
in writing executed according to the statutory restrictions.
Parol evidence to prove the facts from which such a trust
will be implied is clearly admissible. Notwithstanding this
rule it is equally well settled that there are many limitations
to the doctrine. It is not universally true that when the
money of one has gone into the purchase of an estate, a trust,
enforcible against him who has taken the conveyance of the
legal title to himself, will arise, or can be decreed to exist.
One thoroughly recognized limitation is, " that the trust
must result, if at all, at the instant the deed is taken, and
the legal title vests in the grantee. No oral agreements
and no payments, before or after the title is taken, will create
a resulting trust, unless the transaction is such at the
moment the title passes that a trust will result from the
transaction itself." A like limitation is to be found in the
character of the proof requisite to the establishment of the
trust. Courts are very exacting in the requirement of un-
questionable evidence to establish a resulting trust. What-
ever is essential to exhibit the equity of the *cestui que trust*
must appear in a clear and unclouded light. The money
used must be demonstrated to have been the money of the
party claiming the title. It must have been his at the very

time of the purchase, and must have been used for that express object. Its identity must be traceable. Perry on Trusts, vol. 1, § 133, *et seq.*; *Gibson v. Foote*, 40 Miss. 788; *Thompson's App.*, 22 Pa. State, 16; *Dudley v. Bachelder*, 53 Me. 403; *White v. Carpenter*, 2 Paige's Chancery, 217; *Livermore v. Aldrich*, 5 Cush. 431; *Tunnard v. Littell*, 23 N. J. Eq. 264; *Fickett v. Durham*, 109 Mass. 419; *Baker v. Vining*, 30 Me. 121.

Tested by these rules the case now under consideration cannot be brought within the doctrines of resulting trusts, and on that theory the intervenor must fail. No part of the proofs essential to the creation of such an equitable right comes up to the standard fixed by all the authorities. If the agency contended for be conceded, the recovery may not be upheld. There was no evidence that the agent put his principal's money into the location at the time the mining title accrued, nor that any of it went into the work which preceded the location and formed the basis of the title. This is a *sine qua non*—the trust must arise at the time the title is transferred. It is not enough that long before, and for a definite named period, the agent had no funds save what the intervenor furnished. An agreement afterwards to locate, and hold for the loaner, will not do. The money which gets the title must then have come from the claimant. It must be traced into the property and its identity be certain in the changed form. There was no evidence which even tended to prove that what located the claim, provided for the discovery work and antedated the title, was the money of the intervenor. That all subsequent expenses were traceable to him is not of any moment. It neither aids nor retards his recovery. Proof of it was inadmissible unless in some way it was so connected with the prerequisite payments as to tend to substantiate that branch of the case. General evidence that the claimant furnished the purchase money; that the purchaser was impecunious; that so far as the claimant knows the purchaser had no funds save what he was furnished by the *cestui que trust* does not fulfill the requirements as

to the clear, definite, certain application of the *cestui que trust's* money to the acquirement of the legal title resting in the trustee. There was no attempt to show what amount of money was advanced to Johnson at the date of the commencement of the discovery work, what was given him from that time to the filing of the certificate of location, or the completion of the title by the finding of mineral, nor what were the disbursements incident to these things. It is thus impossible by inference, or argument, to find the necessary proof as to the application of the intervenor's money to the procurement of the title. It would violate well settled principles, from which there has never been a well considered deviation, to hold that under the law of trusts an equitable right inured to the intervenor Campbell.

The subsequent transactions between the various parties prevent the application of the law of trusts to support the decree. Johnson held the title to one fourth of the Sierra Nevada lode from the time of its location, September 8, 1879, to the date of his transfer to Peter Campbell, August 6, 1883. Whatever may be the entire history of this transfer, or the motives on Johnson's part which led him to execute the deed, it is sufficient for the purposes of the present inquiry to state the intervenor's story and contention concerning it. It was executed at his request. He is thus bound by whatever legal consequences may attach to it, if he then had an equitable right to the property. The deed was a voluntary conveyance. At its date there was a litigation in prospect with the Iron Mining Company, an owner of the adjacent property. The deed was made solely with reference to the probable suits with that company. The transfer was to avoid the possible jurisdiction of the federal courts which would attach under the law if the title were either in Johnson, or the *cestui que trust*, William L. Campbell. Peter was a resident of the District of Columbia, and any suit between the Iron Mining Company and the thus ostensible owner of the Sierra Nevada could not be brought within the federal jurisdiction. The effect of the transfer was to ren-

der an existing statute inoperative, and was, as being without consideration, an imposition and fraud upon the statute. While it is doubtless true that the deed would have been inoperative for the purpose for which it was intended, if the facts had been learned, it is enough to deprive the intervenor of his right to enforce the trust had it been otherwise sufficiently proven.

An equally insuperable difficulty springs from the later deed from Peter back to Johnson.   The title remained in Peter to September 13, 1884.   He then became embarrassed.   To prevent his creditors from reaching the title which was in him, the property was re-deeded by William, under a power of attorney which he held from Peter, back to Johnson.   If Peter took the property discharged of the trust with which it was burdened in Johnson's hands, Johnson retook the title unincumbered by the obligation.   He took it unembarrassed by the equity, whether or not this be true, and no trust arose at the time of the conveyance.   No money of the intervenors then passed, for it was a voluntary conveyance. By William's consent it was conveyed to Peter, who took it discharged of its obligation, and when it passed to Johnson it was equally free.   Besides, since William presumably permitted Peter to claim credit on the faith of his ownership the property might be subject to Peter's debts, and to transfer it to Johnson to avoid the rights of Peter's creditors, which was the declared purpose of that particular transfer, would, under all the cases, relieve the title of any trust which William could enforce in a court of equity.   No trust can ever result to a grantor when his conveyance is made for a colorable, illegal or fraudulent purpose.   Perry on Trusts, vol. 1, § 165; *Miller v. Davis*, 50 Mo. 572; *Tipton v. Powell*, 2 Caldwell, 19; *Ownes v. Ownes*, 23 N. J. Eq. 60.

This disposes of all the questions needful to be considered, save what arises on a consideration of the rights of William L. Campbell as the holder of his unrecorded deed from Johnson, dated December 7, 1885, and recorded some ten days later than the levy of the writ under which the bank claims.

The status of the attaching creditor and of the holder of the unrecorded deed under the statute on conveyances has been settled. The whole question was reviewed and the proper construction of the statute determined in *McMurtrie v. Riddell*, 9 Colo. 497. According to that authority the bank was entitled to all the protection afforded an innocent purchaser for value, and if it was without notice of the deed, that instrument, and the holder of the title under it, must be subject to the claim of the attaching creditor. The bank had no notice of the deed. This could be easily demonstrated by a very slight review of the testimony. It will become apparent from the subsequent discussion, when the means of knowledge and the notice which it is contended legally follows the opportunity, comes to be considered. It is enough to say that on the question of actual notice the finding is against the intervenor. The fifth finding of fact incorporated into the decree expressly states that the bank " had no notice whatever of the existence nor of the execution and delivery of the deed " at the time of the levy. This is conclusive on the matter, for it is most amply sustained by the testimony. Nothing was ever said to any officer of the bank concerning the deed from Johnson to Campbell. It leaves the discussion to proceed on the matter of the means of knowledge, and of the sort of notice which it is contended the bank had. The court found that the bank " had notice that the intervenor had, or claimed to have, some interest in said mining property so levied on, and had the means of *inquiring of the intervenor* for definite information " respecting it before making the levy. There are two difficulties besetting this proposition. The first is, that what is contended to be notice to put the bank on inquiry is not, in the law, notice at all; and the second is, that the finding is wholly unsupported by proof warranting it. The court might be less assertive in attacking this finding on the theory that ordinarily the conclusions of the trial court are held binding on an appellate tribunal, but since in any event the insufficiency of the notice

must be held fatal to the decree, there need be no hesitancy in upsetting what the court did find on that subject.

There has for many years been a great deal of diversity among the courts in determining the effect of notice to an agent, and deciding when the principal will be bound by the knowledge acquired or possessed by his representative. There ought to be a marked difference in the adequacy of the information to put a purchaser on inquiry, and the sufficiency of that which will charge an attaching creditor with notice and be held to bind him. Investigation always preceded the purchase, and none the levy. The situation of the present controversy does not require us to put the case on this ground. It is less liable to criticism, and beyond dispute in this state if it is rested on this ground; the only notice or knowledge proven is that communicated to the plaintiff's agent, or officer, and it was not shown to be present to the agent's mind at the time of the levy, and the circumstances were not such as to bring it presumptively within his recollection at the time of the transaction. The broader cases which hold that the information must come to the agent at the time of the particular transaction, as in *Houseman v. Girard, M. B. & L. Association,* 81 Pa. St. 256, have much in reason and principle to commend them. But the rule first indicated is comprehensive enough to be decisive of this case, and has received the sanction of our own supreme court. *Armstrong v. Abbott,* 11 Colo. 220; *The Distilled Spirits,* 11 Wall. 356.

The deed of Johnson to Campbell was dated December 1, 1885. The levy was in September, 1886. The notice which it is contended was possessed by the bank was obtained by D. H. Moffat, its president, from sundry conversations with William L. and Peter, his brother. The accuracy of their recollection may be conceded and still the case is not brought within the principle. The first statement about the matter was made at the time of the sale of the "Louisville" to Moffat in December, 1883; the next was about the same time and seems, as narrated, to have been a detailed notice by

Peter, as to Johnson's title in a casual conversation about the "Louisville" trade. The only other pretense of notice was in a conversation between Jerome B. Chaffee and William L. Campbell about a lease on the Sierra Nevada, when Moffat was in the room where the conversation happened. He took no part in it, was not concerned in the transaction, and is only said to have heard because he was in the room when it happened. To charge the bank with knowledge obtained by its president while transacting his private business, months and even years before the deed was in existence which conveyed the only title to which the levy could be subordinated, is to carry the doctrine beyond the reason or the declaration of any known decision. Under Lord Hardwicke's rule, and that followed by the courts of this country generally, as Mr. Justice Bradley stated it to be in the Distilled Spirits case, the evidence would be incompetent and inadmissible. According to the rule laid down in the Distilled Spirits case it cannot be adjudged that the bank was bound by what had been told its president in another transaction in which the bank had no concern. What was communicated to Moffat was evidently neighborly, casual information concerning his friend's affairs, which was more liable to slip from his recollection in twenty-four hours than it was to remain for thirty-six months and be operative to the prejudice of a financial institution of which he happened to be the head. Less weight can be given to what occurred in 1885 in Mr. Chaffee's room than even to this. Moffat was in no sense a party to the conversation. It is not shown that he heard it. It is only as an inference from his presence that the testimony can be said to charge him with the information conveyed by the talk. Such an inference cannot be elevated to the dignity of proof of notice sufficient to affect property rights. There was neither notice, nor anything which in the law can be held to lay on the bank the duty of inquiry. The rights of the attaching creditor must be adjudged superior to those of Campbell under his unrecorded conveyance, and the

decree adjudging the title to be in him free from the lien of the levy is erroneous.

There are other errors assigned and argued which would require consideration if the case had not been reversed on these principal grounds. It was clearly error to permit the intervenor to introduce his books of account relating to transactions long subsequent to the time when the trust was claimed to have been created, and which in no manner tended to support the intervenor's contention respecting the title. The declarations of Johnson concerning the title after the mine had been located, though they strongly tended to support the theory that he had an interest which, if shown, would cast on the intervenor the burden of proving what aliquot part he had paid for, were clearly inadmissible as testimony for the claimant. Further expression of the basis of these conclusions is wholly unnecessary, since the errors are not likely to re-occur on the succeeding trial.

For the reasons expressed, this cause is reversed and remanded for a new trial in conformity with this opinion.

*Reversed.*