RICHFORD WRIGHT, Appellant, vs. ELIZABETH WRIGHT, Appellee.

*Opinion filed October 26, 1909.*

1. TRUSTS—*when intention to create a resulting trust need not be shown.* Where a husband takes title to land bought with his wife's money there is no presumption of a gift or advancement to him, as there is no legal obligation on the part of the wife to support him; and in such case it is not necessary, in order to establish a resulting trust in favor of the wife, to show an intention by the parties to create a trust at the time of the transaction.

2. SAME—*when proof must negative presumption of gift or advancement.* Where there is a legal obligation resting upon the person furnishing the consideration to support the person in whose name the conveyance is taken the law infers an intention to make a gift or advancement to the person named as grantee, and in order to establish a resulting trust in favor of the person furnishing the consideration there must be circumstances attending the transaction which negative the inference of gift or advancement.

3. LACHES—*circumstances explaining or excusing delay should be considered.* In determining whether delay by a wife in seeking to compel her husband to convey to her the title to land purchased with her money shall bar her remedy in equity to obtain such conveyance after his death, the relationship of the parties, the wife's confidence in the husband's promises to convey, her inability to read or write, and her joint possession of the land with the husband as a homestead, are circumstances to be considered.

4. SAME—*fact that wife did not sue husband to compel conveyance raises no inference against her claim.* The fact that a wife failed to sue her husband to compel a conveyance from him of the title to land bought with her money raises no inference that her claim to such land, urged after his death, is unfounded or fictitious.

APPEAL from the Circuit Court of Jackson county; the Hon. WILLIAM N. BUTLER, Judge, presiding.

WILLIAM A. SCHWARTZ, W. F. ELLIS, and JAMES H. MARTIN, for appellant.

McELVAIN & GLENN, and H. CLAY HORNER, for appellee.

Mr. JUSTICE VICKERS delivered the opinion of the court:

Richford Wright, appellant, filed a petition in the circuit court of Jackson county to have the dower and homestead of Elizabeth Wright assigned in certain lands of which Ellis Wright, father of appellant and husband of appellee, died seized. Elizabeth Wright answered the petition, admitting that Ellis Wright, her husband, died seized of all of the lands described in the petition except the west half of the south-west quarter of section 25, township 7, south, range 4, west of the third principal meridian, which said tract appellee averred did not belong to Ellis Wright but that in equity said eighty acres belonged to appellee. Appellee then filed a cross-bill, in which she alleges that she was married to the deceased, Ellis Wright, in May, 1866, and lived with him as his wife until his death, in September, 1907. She charges in her cross-bill that at the time she married Ellis Wright she had money in her own right, which she had received as a pension from the United States government on account of the death of Benjamin Fannin, her former husband, which occurred on October 13, 1863, while said Fannin was a private soldier in Company A, 31st Illinois Infantry; that appellee had drawn a pension at the rate of eight dollars per month from the date of Fannin's death until she married Ellis Wright, in 1866; that her money was, prior to the date of her marriage to Ellis Wright, loaned to Hampton Crawford, whose note, signed by said Crawford and one Crain as personal surety, for $300 was then held as the separate property of appellee. She charges in her cross-bill that soon after her marriage to Ellis Wright, he having learned that she had this money loaned, insisted that she call it in and invest it in land; that she complied with her husband's request and collected the Crawford note and gave the money to her husband, who in a short time thereafter purchased the eighty acres of land now in controversy, using for that purpose $120 of appel-

lee's money, which was the full consideration paid for said land; that Ellis Wright took the deed to said land in his name; that the appellee and her husband moved onto said eighty acres and occupied it as a homestead until the time of her husband's death, September 30, 1907, and that appellee still so occupies said premises; that her said husband told appellee, before he bought this land, that it would be hers and that it would not burn up nor could it be stolen; that after the land had been bought and the husband had taken the deed to himself he often told the appellee that it would be a home for her and that he would change it. The cross-bill prays for the conveyance of the legal title to be made to appellee, on the theory that a resulting trust existed which appellee is entitled to have executed by a conveyance to her of the legal title.

Richford Wright, a son of Ellis Wright by a former marriage and only surviving child, filed an answer to appellee's cross-bill, denying that appellee paid the consideration for said land or any part of it, and charged that his father, Ellis Wright, paid the whole of said consideration with his own money, and that he died holding both the legal and equitable title to said land. A replication to this answer was filed, and the issue thus joined was tried by the circuit court of Jackson county upon evidence presented in open court and a decree rendered in accordance with the prayer of the cross-bill, ordering a deed made conveying to appellee the legal title to the eighty acres involved within thirty days, and in default that the master execute such deed. The court also decreed that appellee have dower assigned to her in other real estate of which Ellis Wright died seized. From this decree Richford Wright has appealed to this court, and assigns error upon that branch of the decree which grants appellee the relief prayed for in her cross-bill.

The following is a statement of the principal facts proven on the trial: Certified copies of pension certificate

and vouchers were introduced in evidence, which show that Elizabeth Fannin, widow of Benjamin Fannin, drew a pension at the rate of eight dollars per month from the 16th day of October, 1863, to May 31, 1866, a total of $252. She loaned $300 to Hampton Crawford, who then lived in Perry county near the Jackson county line. Riley Crawford, a man now about eighty years old and a brother of Hampton Crawford, testified that he knew appellee prior to her marriage to Ellis Wright; that he knew that his brother, Hampton, had $300 borrowed from Elizabeth Fannin; that he was at his brother's house when appellee came and demanded that his brother pay the note; that she said her husband wanted her to collect the note and buy a piece of land; that his brother, Hampton, told her, in his presence, that he did not have the money but would get it in a few days and bring it to her, and that afterwards he saw the note in his brother's possession and it was payable to Elizabeth Fannin, and that the note was burned in witness' house. This witness testifies that he knew the note was paid from having seen it afterwards in his brother's possession. A deed to the land in question from Eliza A. Belsha, Francis S. Smith and Mary C. Smith to Ellis Wright, dated August 1, 1867, was offered in evidence.

Mary Richards, a sister of appellee, testified that after appellee married Wright she visited them very often; that she was at their house almost all of the time; that she remembers the circumstance of the purchase of the land in controversy; that her sister had money loaned which she had received as pension on account of the death of her first husband; that she was present and saw her sister give the money to Wright, and that afterwards Wright told her he had bought this land with that money; that Wright told his wife that it was much better to buy land, because it would not burn up and no one could steal it and that it would be a home for his wife; that he always called his wife "woman;" that he said in her presence: "Woman, I

bought this land with your money but the deed is made in my name; I can change it at some other time." She testifies that the consideration paid for the land, according to her recollection, was somewhere between $125 and $140. The exact amount she was unable to remember. This witness, in the second deposition given by her, states that she often heard Wright say he would deed the land to appellee, but in order to do so it would be necessary for him to deed it to a third person and have said third person convey to appellee, and that he was afraid to do that because such third person might be unwilling to convey to appellee. She testifies that she was present when Crawford came in the afternoon and paid the appellee the money, and that it was given to Wright that evening.

Selden Johnson testifies that he went with Ellis Wright when he made a trip to Chester to see about buying this land; that afterwards he heard Wright talking about the trouble he had in buying the land, and he said that Robert Grant had possession under an old mortgage which was not good and that he could defeat Grant's claim; that this was in the presence of appellee, and appellee said that she was glad of that; that if they got that land they would get all she had. The mortgage referred to was a mortgage executed by Samuel Smith in his lifetime, and the persons whom Wright went to Chester to see were the heirs of Samuel Smith, from whom he afterwards obtained deeds.

Thomas Qualls testified that he had known Ellis Wright for forty years; that about two years ago he was out on Wright's farm on another eighty acres which is west of the land in controversy; that they were on the porch upstairs in a house known as "the mansion," and that Wright then said, "This is known as the mansion and belongs to me," and then, pointing eastward toward the eighty in controversy, said, "That over there belongs to my woman."

William Finn testified that he had known Ellis Wright for forty years; that some thirty years ago he had a con-

versation with Wright in the Bower Hotel, at Ava; that Wright said to him, "Bill, you know these Crawfords?" Witness said, "Yes." He said: "They owed my wife, Lizzie, a lot of money, and I hear they are horse racers and gamblers and they might go broke, and I sent her over to tell them that I was going to put her money in land." On another occasion this witness testifies that Wright said he had paid for the land in controversy with his wife's money. This conversation occurred about ten years before his death, and that he had a similar conversation seven or eight days before Wright's death.

Appellant introduced seventeen witnesses, whose testimony may be summarized by a statement of the principal facts which may be regarded as established by their testimony. It is proven by the neighbors and acquaintances of Ellis Wright that he took possession of the eighty acres of land in controversy, cleared it up and built a house worth $500 and a barn worth $200 upon it; that he had the land assessed in his own name and paid the taxes thereon from the time he bought it until his death; that he rented or leased parts of this tract at different times to different persons and collected the rents; in short, that he exercised all of the usual acts of ownership over the land and that he frequently spoke of it as his land. Some of the witnesses testify that he spoke of the land as his land in the presence of appellee and that she did not correct or contradict her husband's statements. One witness testifies that he tried to buy a strip of the land in question from Mr. Wright, and that he said, "We will go down and look at it," and that his wife was present but made no objection.

Appellant introduced some evidence for the purpose of proving that Mary Richards was not at the home of her sister at the dates mentioned by her in her deposition when she testifies to having heard the several statements of Ellis Wright deposed to by her. While this class of testimony had some tendency toward weakening the evidence of Mary

Richards, it cannot be said that she was impeached to such an extent as to render her testimony unworthy of consideration. Most of the witnesses who were introduced to meet the deposition of Mrs. Richards by showing that she was not at the Wright home at the several times when she claims to have been there, only go to the extent of saying that if she was there they did not see her, or that they have no recollection of her being there on those occasions; and several of them admit, on cross-examination, that they had no special reason for remembering whether Mrs. Richards was there, and that she might have been there without their knowing it.

It was further shown on behalf of appellant that he and appellee were appointed joint administrators of Ellis Wright's estate; that appellant and J. J. Pearson went to appellee's home and made an inventory of the real and personal property belonging to the estate. The land in controversy in this suit was listed in the inventory and the inventory was sworn to by appellee but not by appellant. This inventory was never filed, for some reason, in the county court but was introduced on the trial of this case as an admission against appellee. It is shown that appellee is past sixty years of age, that she has no education and that she signed the inventory by her mark. The evidence shows that when appellant and Pearson were making up the inventory they called for the deeds, and appellee brought them a package of deeds showing title in Ellis Wright to four hundred and ninety acres of land, including the eighty in question. It is also shown that appellee was a quiet, timid woman, and acted in the presence of her husband as though she was afraid to antagonize him in any way; that she never interfered in conversations between her husband and other persons.

Appellant contends that to establish a resulting trust in this case it must be proven by clear and convincing evidence not only that appellee furnished the purchase money and

that the deed was taken in her husband's name, but also that the parties intended that a trust should be created at the time of the transaction. All the cases agree that where a man pays for land and causes it to be conveyed to his wife or child the presumption is that it was intended as an advancement or gift. (*Reed* v. *Reed,* 135 Ill. 482; Pomeroy's Eq. Jur. sec. 1041.) The inference which the law permits to be drawn in this class of cases is based upon the common knowledge and experience of mankind in regard to the motives that usually accompany transactions of that character. Where there is a legal obligation resting on the one furnishing the consideration to support the person in whose name the conveyance is taken, it is said in some of the cases that the law will infer an intention to make a gift or an advancement, and that to establish a resulting trust the transaction must be attended by circumstances that negative this inference, or, as it has sometimes been expressed though not with entire accuracy, by circumstances showing an intention to create a trust. The intention of the parties to create a resulting trust is not necessary to its existence. A constructive trust often arises where the beneficiary not only does not intend to create the relation but has no knowledge of its existence at the time.

All of the cases relied on by appellant in support of the proposition that where the transaction is between members of the same family it is necessary to show something more than the furnishing of the purchase money by one and taking the title in the name of another, are cases where the person paying the consideration was under a legal or moral obligation to maintain the person to whom the conveyance is made. No case is cited, and we have been unable to find any, which holds that where the wife furnishes the purchase money and the deed is taken in the name of the husband a presumption of a gift or an advancement arises. There is a clear intimation in *Francis* v. *Roades,* 146 Ill. 635, and *Madison* v. *Madison,* 206 id. 534, that no such

presumption exists. The reason upon which the presumption rests where the purchase money is furnished by one who is under a legal obligation to maintain the person in whose name the deed is taken, does not apply where the wife furnished the consideration for a deed taken in the name of her husband.

The evidence in this record satisfactorily shows that appellee furnished the entire purchase money for the land in controversy and that the deed was taken in the name of Ellis Wright, and since it is not necessary that the evidence should show anything in addition to these two facts in order to raise a resulting trust, it follows that the decree below directing the conveyance to appellee is free from error, unless appellant's contention that appellee is barred by *laches* can be sustained. In determining whether appellee should be deprived of a remedy in equity on account of the delay in bringing this suit, circumstances tending to explain or excuse such delay should be considered. It is to be noted in this connection that there was no adverse possession in her husband and the occupation of the premises was joint. The intimate relation between husband and wife, and in this case her inability to read and write and her confidence in her husband's repeated promises to convey the title to her, are all proper to be considered in determining whether the defense of *laches* should be allowed to prevail. In *Ryder* v. *Emrich,* 104 Ill. 470, on page 474, this court said: "It is also urged that the great delay in asserting their rights, having waited until after their father's death, is evidence that the claim of appellees is fictitious. It seldom occurs, as experience teaches, that a child sues a parent, whatever the wrong or the right of recovery, and when it is done, so unnatural an act renders the child odious to the community. It would not, therefore, be expected that they would have sued him, however just their claim." The foregoing language is applicable to the situation presented by the facts in the case at bar. No inference that the claim set up by

the appellee is unfounded or fictitious can be drawn merely from the fact that she did not bring a suit against her husband to compel a conveyance and thus break up or disturb her family relation. We think that under the circumstances shown by this record appellee was not barred, by a mere lapse of time, from maintaining her cross-bill.

Finding no reversible error in the record the decree of the circuit court of Jackson county will be affirmed.

*Decree affirmed.*