On Rehearing.

Hurlbut, J.,
rendered the opinion of the court.
This suit was instituted May 19, 1909. Appellees (plaintiffs helow) allege in their complaint, in substance, that they are the sole heirs at law of James Davenport, who died intestate about April 8, 1909, and as such heirs are the owners and entitled to the possession of lot 22, block 186, Stiles’ Addition to the City of Denver, said Davenport dying intestate and being at the time of his death the record owner in fee of said premises; that on or about April 6, 1909, defendant (appellant) wrongfully took possession of the premises, and wrongfully withholds the same from the possession of plaintiffs.
Answer, including cross-complaint, was filed, admitting the death of James Davenport, and that the legal title to said premises was in him at the time of his death, but denying the other allegations of the complaint. In the cross-complaint it is alleged that at the time of the death of said Davenport he held the premises in trust for defendant; that Davenport married defendant’s *253 mother, Ella Kaseby, October 8, 1891, at which time defendant was three years of age; that her mother died intestate in Denver, October 3, 1901, leaving, as her sole heirs, defendant and James Davenport, (her husband); that on and prior to December, 1894, the mother had saved up and had, as her own money, upwards of $700, which she had earned by and through her personál labor; that Davenport used said sum in the purchase of the' undivided one-half interest in said premises, taking the title in his own name, but in trust for defendant’s mother; and that during his lifetime Davenport, recognized the title and interest aforesaid of the mother in and to the premises. A supplemental answer was -thereafter filed, alleging that since the commencement of the action defendant had acquired the interest of plaintiff Thomas .Russell in the premises, which the evidence showed to be an undivided one-thirtieth. Issues were joined by replication. Judgment was rendered in favor of appellees (excepting Thomas Russell) adjudging them to be the owners of the property, and entitled to the possession thereof, Thomas Russell’s interest being adjudged to be in defendant.
The record is short, contains but little testimony, and is practically undisputed. In order to recover upon the issues in this case, defendant must have established at the trial, a resulting trust in the property in issue. In other words, the proofs must show that the money of defendant’s mother was used by Davenport in the purchase of. the said real estate, the title to which he' took in his own name, and how much of said money was so invested. Under the pleadings here, if the evidence clearly and satisfactorily shows that any sum of money belonging to the separate estate of the wife was used by Davenport .in the purchase of this property, and the amount thereof, or the proportion which it bore to the entire purchase price, the law would fasten a resulting *254 trust thereon as the equitable result of such investment, to the extent of the interest established by the trust. As to such evidence the following is an epitome of all there is upon those issues, vis.:
Deposition of J. W. Barnett:
“Mrs. Davenport showed me a check for $500 which they (she and her husband) owned together. * * * Mrs. Davenport was a hard working, saving woman; she was a laundress and worked out by the day and gave it to Mr. Davenport to pay on the property and support the family.”
This deposition was taken in Missouri about nineteen years after the marriage of Davenport and the mother. Deponent states that he lived with them for four months after the marriage, but fails to state when this was. The deposition states that while he lived with the Davenports the mother showed him a $500 check which she and her husband owned together, but does not pretend to state that any part thereof went into the property; nor how much of the $500 each one owned; nor how he obtained his knowledge that the mother worked out by the day and gave her earnings to Davenport to pay on the home. His entire evidence in this behalf has the appearance of being hearsay.
Deposition of Pat Ming:
“During our conversation he (Mr. Davenport) told me that when he married Ella Barnett he was in debt and she gave him money that she had previous to her marriage, to help him out of debt for their home.”
This deponent met Davenport in Missouri sixteen years before the deposition was taken. He states he knows nothing about the purchase of real estate by either Davenport or his wife. He was detailing a conversation which had taken place about sixteen years before, and the alleged statements thereof are flatly contradicted by the record, which conclusively shows that Davenport was *255 not in debt at the time of the marriage; that he had bought and paid for an undivided one-half of the home property two years before the marriage, and did not invest a dollar in purchasing the remaining half until more than three years after the marriage, at which time he bid that interest in at a foreclosure sale for money he had loaned thereon. So this evidence should be wholly disregarded.
Mahala Ming testified:
■ “Mrs. .Davenport was my sister. They purchased and owned their home in Denver, Colorado. They both saved money from their work, and my sister took from Kirkwood, Mo., when they were married about $500, which was put into the home. My sister, Mrs. Davenport, went to Denver in 1891 from Kirkwood, Mo., taking with her $500. She married Mr. Davenport shortly after and helped him to pay their home out of debt, which Mr. Davenport had bought before their marriage. Mrs. Davenport' was a hard working, saving woman. She saved her money and improved the home, and helped pay it out of debt. ’ ’
This evidence is necessarily pure hearsay, except as to the $500 which deponent says was taken by her sister Mrs. Davenport, from Kirkwood. The deposition clearly indicates that she was never in Colorado but once, vis., in 1901 during the six weeks of her sistef’s last illness. With the exception noted, it is clear that this witness had no personal knowledge whatever of a single issuable fact testified to by her. She does not pretend to state that Davenport ever spoke to her concerning such matters.
All of these depositions are by witnesses who were relatives of appellant, and who no doubt gave their testimony as favorably for her as their consciences would warrant.
*256 Testimony of Anthony Dyer:
££We (Mr. Davenport and witness) were talking about Mrs. Davenport, and I asked him if Nellie didn’t come in for her mother’s share of the property, and he said yes; that her mother helped him make the money to get the property with, and he certainly would see that she would have it, * * * if it was not for Nellie and her mother he wouldn’t be able to hold the property.”
If Davenport made the statement attributed to him by this witness, then it is clear that he considered the entire home property as his own, and intended at some future time, by deed or will, to transfer the same to appellant. If Davenport had taken the mother’s money and put it in the property, agreeing and promising to hold it in trust for her, and that it was to be hers, as pleaded in the cross-bill, then it is reasonable to suppose that he would not have made such statements.
Walter C. Scruggs testified:
££Iie (Davenport) told me his wife was going ahead with the property and keeping up the payments, for he wasn’t making a dollar, and ‘her mother worked hard and has put more money in this place than I have. ’ That was about a month before he died. * * * Just about a year * * * about six months before he died * * * I was talking with him again about his property * * * I asked him £How much you got now?’ 'Well,’ he says, £$1,500 in the bank,’ and he says the most of that was his wife’s money that she had made before she taken sick and died, washing and ironing.”
This evidence warrants a strong presumption that the mother put no money into the home property, but on the contrary, whatever money she earned, as well as the $500 brought by her from Missouri, represented the greater part of the certificates of deposit amounting to $1,500.
It must not be overlooked that the distinguished *257 judge who tried the case below without- a jury found the issues against appellant. As we read the record it so strongly supports the findings and decree that nothing short of an arbitrary refusal to follow the decisions of our supreme court, as well as of this court, would warrant us in disturbing the decree.
William Barnett testified that at the time 'he and Davenport bought the property they borrowed money from one Bleed to make part payment thereon; that they paid Beed’s note within two years from the time they bought the property, vis., 1887; and that he afterwards borrowed some money of Davenport, upon the property, in 1891.
Upon this evidence, what amount of money could the trial court say was paid by the mother upon the purchase price of the property, or what amount she invested therein, and when? True, the witness Ming states that the mother took about $500 from Kirkwood, Mo., when she married, and that it was put into the home, but there is no evidence to show at what particular time any money was paid on the home, what specific amount, and where or to whom the same was paid. No circumstances whatever are shown attending the payment of any money by the mother to Davenport, either for the purpose of being applied upon the purchase price, or as a loan on the property. While, the trial court found that the mother may have furnished some money towards the purchase price, it suggested that it was a “guess” as to how much. The evidence wholly fails to sustain the allegations of the eross-complaint, which aver, (a) that prior-to December, 1894, the mother accumulated about $700; (b) that Davenport used the same in the purchase of the one-half interest in the property; and (c) that he agreed and promised at the time of such purchase that such interest should be the property of the. mother, or that he held the title, in trust for her.
*258 The record shows that on November’ 16, 1891, and shortly after the marriage of deceased and defendant’s mother, deceased loaned Barnett $600, and took a trnst deed to secure payment thereof on Barnett’s undivided one-half interest in the. property; that afterwards, on November 28, 1894, this trust deed was foreclosed, and trustee’s deed conveyed Barnett’s interest in the property to deceased, from which time to the time of his death he was the record owner in fee of all the premises, having acquired the other half interest about two years prior to the marriage. There is no evidence that the mother contributed any money to the purchase of this property prior to her marriage. In none of the transactions concerning the. loan of $600 after the marriage is there a word of testimony showing that the mother had anything to do with it, or that she was in any way mentioned concerning the same; nor is there any testimony tending to show any agreement between Davenport and the mother, or any conversation by or between them, respecting any money paid by the mother upon such loan. In fact the record fails to show anywhere that the mother ever paid one dollar at any time or place, or under any circumstances, which was applied, or to be applied, upon the purchase price of Barnett’s interest, or contributed as part of the $600 loan. The only evidence disclosed by the record tending to show such payment or contribution is that Davenport during his lifetime had said the mother gave him money after the marriage to help him out of debt, and that she put more money into the property than he did. These statements attributed to Davenport, however, appear to be discredited by his other statements in the record. No witness pretends to say that at the time the trust deed or trustee’s deed was executed and delivered, the mother paid or contributed one cent toward the purchase price or the loan. One witness testified that he had known Davenport since 1882; that he never knew *259 him to he without money — the amount he could not state; that he had seen him with as much as $1,000; that from 1887 to 1891 he had some certificates of deposit, but could not tell the amounts; and that Davenport kept these certificates at witness’s house. The evidence above quoted (which is practically all there is upon the subject) tends to show that defendant’s mother had, at the time of her marriage with deceased, something like $500 in money, but, as above stated, there seems to be wanting any kind of evidence or testimony showing that she paid any specific sum of money to deceased at any stated time or place, or in what manner she paid the same, whether in money or by cheek, or under what circumstances. "We presume this fact became, in the mind of the trial judge, an insurmountable obstacle to decreeing an equitable lien or resulting trust in the premises in favor of defendant.
It is well settled in law that a valid, recorded deed, conveying real property to the grantee, imports a good title to the premises in such grantee, and all jurisdictions are practically unanimous .in holding that a resulting trust in real property will not be declared to exist unless the evidence in support thereof is clear, positive, satisfying and convincing; indeed, as some courts say, it must be beyond a reasonable doubt, and conclusive. Here the title was of record by warranty deed in James Davenport, and nothing short of the character of proof stated would warrant a decree fastening a resulting trust in behalf of defendant upon any part or portion of the premises. Of the many cases we have examined, we fail to find one even intimating that evidence of the character and quality disclosed by this record is sufficient to establish a resulting trust against real property. That the proof must be of such character and sufficiency as above stated, to establish a resulting trust, is supported by an overwhelming weight of authority. None of appellant’s authorities are in conflict with the rule stated, but many of them spe *260 cifically announce and follow the same. The following authorities constitute a partial list supporting the rule, vis.: Whitsett v. Kershow et al., 4 Colo., 419; Lundy v. Hanson, 16 Colo., 267, 26 Pac., 816; McClure, etc., v. La Plata County, 19 Colo., 122, 34 Pac., 763; Nesmith v. Martin, 32 Colo., 77, 75 Pac., 590; Doll v. Gifford, 13 Colo. App., 67, 56 Pac., 676; Freeman v. Peterson, 45 Colo., 102, 100 Pac., 600; Reed et al. v. Reed et al., 135 Ill., 482, 25 N. E., 1095; Olcott v. Bynum et al., 17 Wall., 44, 21 L. Ed., 570; Wells et al. v. Messenger et al., 249 Ill., 72, 94 N. E., 87; Woodside et al. v. Hewel, 109 Cal., 481, 42 Pac., 152. The case last cited is well reasoned, persuasive and forceful, and holds to the rule, under facts and circumstances, purposes of action, and relief sought, nearly identical with those of the case at bar.
In those authorities cited by appellant, holding that a resulting trust had been established, we observe that they all show that the one who created the trust either paid, or caused t'o be paid, the consideration for the conveyance, or surrendered property, or valuable interests, for that purpose, and that such payments, etc., were established by clear and positive evidence showing the amounts, dates, places and circumstances thereof; that is to say, that, if no evidence had been given by the party denying the trust, the court had ample, convincing evidence before it upon which to render a decree establishing the trust. In the instant case there is practically no dispute of defendant’s testimony. The weakness occurs in the uncertain, unsatisfying and doubtful character of the evidence relied upon by her to establish the trust.
The trust sought to be established by defendant is what is known in law as a resulting trust. Many definitions of this character of trust may be found in the books. The following.is taken from Bouvier’s Law Dictionary (Bawles’ revision), vol. 2, p. 914, viz.:
*261 “Resulting Trust. A trust raised by implication or construction of law, and presumed to exist from the supposed intention of the parties and the nature of the transaction. * * #
“A resulting trust must arise at the time the title is taken. No subsequent oral agreement or payment will create it.”
In First National Bank of Denver v. Campbell, 2 Colo. App., 271, 30 Pac., 357, the court, speaking of resulting trusts, says:
‘One thoroughly recognized limitation is, “that the trust must result, if at all, at the instant the deed is taken, and the legal title vests in the grantees. No oral agreements and no payments, before or after the title is taken, will create a resulting trust, unless the transaction is such at the moment the title passes that a trust will result from the transaction itself.” A like limitation is to be found in the character of the proof requisite to the establishment of the trust. Courts are very exacting in the requirement of unquestionable evidence to establish a resulting trust. Whatever is essential to exhibit the equity of the cestui que trust must appear in a clear- arid unclouded light. * * * The was no attempt to show what amount of money was advanced to Johnson at the date of the commencement of the discovery work, what was given him from that time to the filing of the certificate of location, or the completion of the title by the finding of mineral, nor what were the disbursements incident to these things. It is thus impossible by inference, or arguments, to find the necessary proof as to the application of the intervenor’s money to the procurement of the title.” — Smith v. Turley, 32 W. Va., 14, 9 S. E., 46; Warner v. Bowdoin Square Baptist Soc., 148 Mass., 400, 19 N. E., 403; Ducie v. Ford, 138 U. S., 587, 11 Sup. Ct., 417, 34 L. Ed., 1091; Knox et al. v. McFarran, 4 Colo., 596.
In addition to appellant’s contention already noticed, *262 there are two others which she relied ón for reversal, ■viz.:. ■ (á) Alleged error in the construction óf the law by the lower court, concerning deeds of real property between husband and wife, where the consideration is not ■paid by the one taking title; (b) refusal of the court to allow defendant to testify as to a conversation between her husband and deceased, which took place the day after defendant’s marriage.
As to the first ground, appellant’s, position is supported by the great weight of authority. Her contention is to the effect that when a husband pays the purchase money and takes a conveyance in the name of his wife the presumption arises that he intended it as a gift, and -there is no presumption of a trust in such case; while on the other hand, if the conveyance be taken in the name of the husband, the purchase money being paid by the wife, no presumption of an intention to make a gift arises, but the presumption of a resulting trust in favor of the wife at once arises, and the husband will be deemed to bé a trustee of the property thus acquired, for her benefit, unless he is able to overcome such presumption by establishing a different intention. The court below assumed, and maintained throughout the trial, the position that the rule applied to husband and wife equally; in other words, that if the conveyance of the property be taken to the husband, which was paid for by the wife, the law raises the presumption that she intended the same to be á gift. This was an erroneous view of the law entertained by the court, but we are unable to see wherein appellant was •prejudiced thereby. Had the court ruled correctly on the question, it would still have been necessary for appellant to'prove at the trial-the facts constituting a resulting trust,' as pleaded in her answer. ' As we read the récord, no evidencé offered by defendant was excluded by reason of the court’s-views on this question. On the contrary, the record manifests á decided liberality ón -the part of *263 the court in admitting evidence favorable to defendant. This can be'accounted for in view of tbe court’s expressed sympathy for defendant. As to the rule recognizing the distinction in conveyances between husband and wife,‘the following authorities are in. point and appear to Support such distinction beyond controversy, vis.: Doll v. Gifford, supra; Kline, Adm’r, v. Ragland, 47 Ark., 111, 14 S. W., 474; Wright v. Wright, 242 Ill., 71, 89 N. E., 789, 26 L. R. A. (N. S.), 161; Heath v. Slocum, 115 Pa., 549, 9 Atl., 259.
: The remaining question for consideration pertains to ¡the ruling of the lower court in refusing to allow defendant to testify as to a conversation between her husband and deceased concerning the matters in issue, on the day sxipceeding her marriage. It would appear from the record that the court held defendant to be disqualified under the act pf 1907, page 629, Session Laws of that year, which reads in part as follows:
■ • “In any such action, suit or proceeding, any adverse party or parties in interest may testify as to any‘conversation or admission, or as ’to all matters and things connected with the subject-matter of'said action, suit or proceeding, and which conversation and admission and matters and things aforesaid, occurred before the death and in the presence of such deceased person nnd also in the presence of - any member of the family of- such deceased person over the age of sixteen years, or in the presence of any heir, legatee or devisee of such dpceased person over the age of sixteen years; provided, however, that such member of the family, heir, legatee or devisee, as the case may be, is^present at the hearing of said action, suit or proceeding, or whose testimony is or may be procurable at such trial.”
Appellant contends that under the act she was qualified to testify, claiming that the evidence sought to be elicited pertained to a conversation between her husband *264 and deceased in her presence, that she was an adverse party in interest, that the conversation related to matters and things connected with the subject-matter of the action, and that at the time of the conversation she was a member of the family of said deceased, over the age of sixteen years. The question here raised is an important issue on this appeal. The evidence, shows that from September 30, 1907, to April 8, 1908, defendant, her husband, and déceased lived together harmoniously, in the house in controversy, and defendant took care of. the house and did the work; also that defendant and her husband occupied deceased’s house with him, upon his urgent invitation. There is no evidence as to any definite agreement between these three parties concerning their joint occupation of the premises. The evidence, taken as a whole, rather tends to show that they were living together in pleasant family relations, without any definite contract between them concerning the household expenses and occupancy of the home. Under this state of the record it becomes necessary to construe the phrase, “in the presence of any member of the family of such deceased person,” found in the act. If defendant was not a member of the family within the intent thereof, then the court’s ruling was right; otherwise not. It is true the husband testified as to the conversation between himself and deceased concerning a number of matters, but nothing was testified to concerning the real property in issue; on the other hand, defendant was interrogated specifically as to the same. It is suggested by appellees that if the court erred in excluding defendant as a witness, it is error without prejudice, as the conversation had already been testified to by the husband, and her testimony would be merely cumulative. We cannot adopt this reasoning. If a competent witness, defendant could have testified to the entire conversation. It cannot be presumed that she would have simply corroborated the *265 testimony given by her husband. He may have omitted in his testimony a substantial part of the conversation, which defendant, if a competent witness, could and probably would have supplied, had she been allowed to testify.
The construction of the statute, respecting the intent and meaning of the legislature in the use here of the word “family” appears to be necessary. Innumerable courts and text writers have judicially defined this word, but no decision can be found which attempts to give it a fixed, definite and invariable meaning when used in statutes. It seems to be generally conceded that it has several meanings. Its broadest one includes all those who are descended from one common progenitor — thus of the same blood. In a less comprehensive sense it means a collective body of persons living together and constituting one household under one head. In a still more limited sense it means father, mother and children. It is also defined as follows: “Family, at law, is a collective body of persons who live in one home, under one head or manager. ” 3 Words & Phrases, p. 2673. It has also received countless interpretations as found in statutes concerning homestead exemptions, and exemption of personal earnings of the head of a family, etc.; likewise when found in wills and codicils. Its meaning has been often adjudicated when found in statutes concerning widows’ allowances, etc. It seems to be generally held that in the absence of a statute specifically defining its meaning its purport and effect are to be determined by the context of the statute and consideration of the subject-matter to which it refers. One court, in Roco v. Green, 1 Tex., 438, has laid down the following rule:
“We deduce from the authorities the following general rules to determine when the relation of a family, as contemplated by law, exists:
“1. It is one of social status, not of mere contract.
*266 ' ££2. Legal or moral obligations on the head to support the other members.
“3. Corresponding state of dependence on the part of the other members for this support.”
However, that case was founded upon a construction of a section of the Téxas' state constitution which reserved from forced sale certain designated property, which, by the act, withdrew the same from the estate of a deceased person <£in case a constituent of the family survived.” It was there held that a married daughter with her children, residing with her mother, was not a constituent member of the family, such as entitled her and her children to the homestead upon the death of the mother. Many cases are cited by counsel in their briefs for the purpose of* supporting their views respectively upon this question, but our attention has been called to' none which are in point, or which are of much assistance in determining the question.
It will be noticed that our 'statute of 1907, above quoted, was merely an addition to the law then existing.' As the law existed at the time of its enactment, defendant would not have been a competent witness for any purpose in this case. Under the statute of 1907, is the defendant a competent witness under the facts here shown? We think not. A reasonable inference, as to the purpose of the legislature im enacting, the statute mentioned, would be, that in this class of actions all evidence pertinent to the issues ought to be admitted when such rule would work no injury or prejudice to the estate, or to any party or person interested as heirs or beneficiaries in the result of the proceedings. It is probable that* in this kind of an action any conversation concerning the subject-matter of litigation, had, between deceased and a' third party, in the presence of an heir, legatee or devisee of 'the deceased* or in the presence of a member- of his family* would' not result in injury:tuthe.estate, because, in theory at least, *267 the interests of deceased’s family, his legatees, heirs and devisees, would naturally lie with the administrator or executor, and their evidence would be available to assist in determining the truth or falsity of the facts detailed by such conversation. The common-law authorities generally concede that there is no duty imposed on a husband or wife to provide for, support or maintain, step-children.; Still, it is generally held that if such children are taken into the family as constituent members thereof, and treated and fostered as children of the whole blood, they will be considered members of the family and entitled to such support. In such case, however, the rule is, not to be interpreted as extending the right of inheritance to those entitled to such support. The following cases involve an interpretation of the word “family” as used, in divers statutes, vis.: Town of Manchester v. Town of Rupert, 6 Vt., 291; Menefee v. Chesley, 98 Iowa, 55, 66 N. W., 1038; McMahill v. Estate of McMahill, 113 Ill., 461; Smith v. Wildman, 37 Conn., 384; Bowne v. Witt, 19 Wend. (N. Y.), 475. These cases are instructivé as showing the different views entertained by the various courts in construing, the meaning of the word “family” when used in statutes. • - >
Our conclusions are that as to the competency of the .defendant as a witness, the statute relied on must be considered in connection with, and controlled by, the statutes- of descent and distribution, -rather than the meaning of the word “family” as deduced from any other statute; and.that the words “member of-the. family” of such deceased, in the sense here used, include only such., persons living with -the deceased,- as would inherit from him by the laws .of descent. Others,; such as heirs, lega-, tees, and devisees, who do not live with .deceased so, astp; constitute members of. his. family, are specially men-tioned in the statute. -The .court, therefore;-.did.not.err, in excluding defendant as a witness.
*268 We do not think the record discloses sufficient proof to warrant a decree fastening a resulting trust upon the property; nor was the proof sufficient to warrant a decree for an equitable lien in favor of defendant.
In view of the able dissenting opinion written by our brother, Bell, we feel impelled to add a word to what has already been said.
The court does not seem to be divided on any legal or equitable principle involved in the majority opinion, but the disagreement arises from an analysis of the testimony and the force and effect to be given thereto. True, the record shows that appellant, as well as her mother and step-father (Davenport) were poor but industrious colored people; but it shows with equal clearness that appellees were also respectable and poor colored people; in addition to which it discloses that appellees were the heirs at law of Davenport under the statutes of descent of this state. The legislature, as the supreme law-making power of the state, might have conferred right of inheritance upon step-children, but it has not done so. The courts do not question the wisdom of laws enacted by the people’s representatives, but they look only to the enforcement of the laws as they find them.
The minority opinion invokes the maxim “There is no wrong without a remedy. ’ ’ The converse is also true, as illustrated in this case. The remedy sought fails, because in a legal sense there was no wrong suffered or shown. We would suggest that the maxim “Damnum absque injuria” is recognized and observed in every court where the common law is practiced, and under its observance untold injuries of a moral or civil nature are suffered in individual cases, for which there is no redress. The maxim can be illustrated. Suppose the mother, prior to her death, had been the record owner of this property and had deeded or devised the same to her *269 husband, thereby disinheriting her own flesh and blood. No doubt this would be considered a moral wrong; indeed it would have worked practically the same moral wrong against which Judge Bell so eloquently inveighs; but who can say that any known law, or rule of equity, could be invoked in such a case to deprive Davenport and his lawful heirs of the interest so conveyed? In other words, the distinction between the views, as expressed by the minority opinion and the majority opinion, comes to this: The majority opinion recognizes the statutes of descent and distribution and the unbroken line of decisions of the highest court of this state as controlling until set aside by the legislative branch of the state government; while the minority view is that when said statutes and decisions seem to conflict with the personal view of an inferior court concerning moral questions they have no binding force.
The evidence here well justifies a presumption that Davenport intended his step-daughter to have the $1,500 in interest-bearing bank certificates which he had turned over to her, and which she possessed at the time of his death; but that he desired the real property to go to his lawful heirs. "While the evidence shows that on several occasions he stated he intended to give the real estate to the step-daughter, the fact remains that he never evinced any intention, by act or deed, to do so. , He. had ample opportunity to consummate his alleged intention, and even in his last sickness there were several days. before death in which he could have transferred the property to appellant, either by will or deed. . .,
It cannot be said that this court has in any way over-. looked appellant’s interests, for in a recent decision it has reversed a judgment brought here by her, in order, that she might have the full benefit of a jury trial upon. issues which involve her material property rights. .
*270 The former opinion is withdrawn, and the judgment will be affirmed.

Judgment Affirmed.

Bell, J., and Morgan, J., dissent.