CLARA A. OLDHAM *et al. vs.* EDGAR C. OLDHAM
JUNE 11, 1937.
PRESENT: Flynn, C. J., Capotosto, Baker and Condon, JJ.

CAPOTOSTO, J. This bill in equity is brought to establish a trust in certain real estate and moneys. After hearing on bill, answer and proof, a final decree was entered in the superior court granting the prayer of the bill. The respondent has brought the cause to this court by appeal from that decree.

The real estate in question is located in the city of Central Falls. It was bought in 1872, the deed running to John A. Oldham and his wife Julia, as tenants in common. Two sons were born of this marriage: Edgar C. Oldham, the respondent, in 1874, and Joseph Oldham, in 1876. About 1879, John A. Oldham began to suspect the honesty of a business associate and to fear that his interest in the property might be subjected to the claims of undisclosed creditors created by his associate. On June 11, 1879, John A. Oldham, through an intermediate grantee and by warranty deeds duly executed and recorded on that day, conveyed his one-half interest in the property to Julia, who, on September 1, 1879, together with her husband, mortgaged the entire estate "in her own right" to Nancy W. Bowen for $900. This mortgage was transferred a number of times and was finally discharged February 20, 1923. The wife, Julia, died intestate October 11, 1879.

John A. Oldham remarried in 1884. The complainants are the children by his second wife, Amelia. The children of the first marriage continued to live with their father until about 1897, when Edgar married and Joseph went away to work. Joseph was killed in a railroad accident on June 15, 1905. He was not married and died intestate. Edgar then came back to his father's home, and shortly thereafter the father, who was Joseph's sole beneficiary under our statute for death by wrongful act, petitioned the probate court of the city of Central Falls for the appointment of Edgar as administrator of Joseph's estate, and he was so appointed. By quitclaim deed

of July 3, 1905, in which the wife, Amelia, did not join, John A. Oldham conveyed a one-half interest in the property to Edgar, believing, as stated in the deed, that he had inherited from Joseph the share of the estate that came to Joseph from his mother, Julia. On August 2, 1905, the father assigned to his son, Edgar, his claim against the railroad company for damages arising from Joseph's death and, in October of that same year, Edgar, as administrator of Joseph's estate, received $6000 net in settlement of that claim. By a written release, dated October 25, 1905, the father released to Edgar all his right and interest in this money.

·It appears from competent evidence that the father had the utmost confidence in Edgar and that Edgar was given the release of the $6000 with the understanding that he would hold the money for the father's benefit and would pay it over to him as wanted.· In 1907, however, we find the father saying to his stepson, Ira S. Ripley, that "as soon as Edgar got all his property . . . he had treated him something shameful." From 1908 until the father's death in 1919, and from that time to February 20, 1923, when a settlement was made between the parties, and to which we will presently refer in greater detail, there was considerable litigation between John A. Oldham and Amelia Oldham, on the one side, and Edgar Oldham, on the other. In all this litigation the same attorneys, who now appear for the complainants and the respondent, represented the same conflicting interests as in the instant case.

The testimony shows that in 1908 John A. Oldham sued his son Edgar in assumpsit for money had and received to recover the $6000 in Edgar's possession. The travel of this case is unimportant, except to state that it was still pending in 1923. In 1915, a bill in equity was brought in the name of John A. Oldham, by his next friend and wife, Amelia Oldham, against Edgar to establish a trust in the $6000 and for a cancellation of the deed of 1905 from John A. Oldham to his son Edgar. This bill, although heard on demurrer and pleas, was never tried on its merits and was a pending case

in 1923. In November 1920, a little over a year after his father's death, Edgar notified Amelia in writing to quit the premises that she had occupied with her husband since her marriage, whereupon Amelia brought a bill in equity against Edgar to restrain him from instituting ejectment proceedings upon grounds that are not material to the matter now before us. This case, like the other two, also was pending in 1923.

Following extended negotiations by the attorneys, a settlement was agreed upon between Amelia Oldham and Edgar, which was carried out on February 20, 1923. On that day all pending cases were entered "settled" in court by stipulation of the parties, and in consideration thereof Edgar conveyed to Amelia a life estate in and to the property where she and the complainants were living, and further, Edgar, as executor of his wife's estate, discharged the $900 mortgage on that property which his mother, Julia, originally gave to Nancy W. Bowen in 1879 and which through successive transfers had come into the possession of Edgar's wife in 1905.

In connection with the stipulations entered in court settling all the cases then pending, it is important to note that in the law case of 1908 and in the equity case of 1915, in both of which the ownership of the $6000 was directly in issue, the stipulations were signed by Amelia Oldham personally as well as by her attorney. The testimony shows that this was demanded by counsel for Edgar "to make sure that she knew that the cases were being settled." Amelia, with her two children, the complainants in the instant case, thereafter occupied the premises without further interference by Edgar until she died.

Upon Amelia's death in 1933, Edgar notified the complainants to quit the premises and then instituted trespass and ejectment proceedings. The complainants thereupon, on December 20, 1933, brought the present bill. Their contention is that John A. Oldham was the beneficiary of a resulting trust in the real estate under both the deed of 1872

and 1879, and also the beneficiary of a constructive trust in the $6000 that Edgar received as administrator of Joseph's estate. They further contend that upon the death of John A. Oldham, these trusts resulted to the benefit of Edgar and of the complainants, they being the three surviving children and heirs of John A. Oldham. The superior court decided in favor of the complainants on all these issues.

We will start our consideration of the complainants' claim of a resulting trust in the real estate by setting forth the reasons given in the rescript of the trial justice. His conclusion that there was a resulting trust under the deed of 1872 rests on the sole ground that the entire purchase price for the property was paid by John A. Oldham. He finds a resulting trust under the deed of 1879 from certain facts and inferences. In a general way, the facts upon which the court relies in this latter instance are that when John A. Oldham conveyed his half interest in the property to his wife, Julia, on June 11, 1879, he feared that the property might be subjected to the creditors created by his business associate, whose honesty he suspected; that his wife at that time was seriously ill with an incurable disease and that she died shortly after the conveyance; that the deed apparently remained in his possession until it was presumably abstracted by Edgar in 1907; that he and his family continued to occupy the premises for many years following the death of Julia in 1879; and that during those same years he is said to have stated on various occasions that he owned the property. The inferences that the court draws from these facts in support of its conclusion of a resulting trust are that John A. Oldham intended to convey only the bare legal title in his share of the property to his wife Julia in order to protect that property from the claims of creditors; that it was unreasonable to believe that he transferred that property to a very sick wife "by way of advancement or gift, knowing that upon her decease he would forfeit all ownership over it; and, more particularly, that as Edgar had practi-

cally abstracted the deed from his father's possession in 1907, the complainants should be given "the right to require Edgar to prove delivery of the deed to Julia Oldham."

The deeds in the instant case are from husband to wife and not between strangers. Where a husband purchases real property and takes the title in the names of himself and wife, or conveys property to his wife, no trust results in favor of the husband in the absence of fraud. The transaction is presumed to be a gift or advancement for the benefit of the wife. 3 Pomeroy, Equity Juris., (4th ed.) §1039. In such cases the love and affection of marriage and the natural duty of the husband to provide for his wife operate in equity as a money consideration does between strangers. *Harden* v. *Darwin & Pulley,* 66 Ala. 55; *Jackson* v. *Jackson,* 91 U. S. 122; *Wright* v. *Wright,* 242 Ill. 71. In *Hudson* v. *White,* 17 R. I. 519, a husband purchased and paid for certain real estate, but the deeds were taken in the name of his then wife. In discussing whether a resulting trust arose under the facts of that case, which are clearly distinguishable from those in the case at bar, the court, at page 522 of that opinion, says: "In order to establish a resulting trust in favor of the complainant, in any of the land set out in the bill, it is incumbent upon her to prove, *first,* that said Henry R. Mathewson paid the purchase-money therefor; *second,* that he did not intend the conveyance thereof to his wife to operate by way of advancement (there being a presumption that it was so intended when a husband pays for real estate and takes the deed to his wife)."

A resulting trust arises by operation of law the instant the estate passes and is not subject to change afterwards by any mere oral declarations. *Watson* v. *Thompson,* 12 R. I. 466; *Gooding* v. *Broadway Baptist Church,* 46 R. I. 106. The presumption of a gift or advancement that arises in a transfer of property from husband to wife is rebuttable, but the evidence offered to prove a contrary intention must consist of matters substantially contemporaneous with the purchase or transfer so as to be fairly connected with the trans-

action. 3 Pomeroy Equity Juris., (4th ed.) §1041. Statements by a husband affecting a previously executed transfer of property from himself to his wife, especially if the wife has since deceased, should be weighed with care, for as the court says in *Lane* v. *Lane*, 80 Me. 570, 578, "A man is not permitted to bestow in this way to-day, and take it back tomorrow." Evidence to support a resulting trust in such cases must be "full, clear and satisfactory", and the burden is upon the claimants. *Hudson* v. *White, supra; Reynolds* v. *Blaisdell*, 23 R. I. 16; *Gooding* v. *Broadway Baptist Church, supra; Paulson* v. *Paulson*, 50 R. I. 86.

Mindful of our well established rule that on an appeal in equity, where the evidence is conflicting, the findings of fact by the trial justice are entitled to great weight and will not be set aside unless they clearly fail to do justice between the parties, we have examined the evidence in the instant case with extra care. Our examination clearly shows that the facts and circumstances immediately surrounding the transactions in 1872 and 1879 do not warrant the conclusions of the trial court. In so far as the deed of 1872 is concerned, there is an absence of any testimony, excepting for the fact that the husband may have paid the entire purchase-price for the property, that in any way rebuts the presumption of a gift or advancement to the wife of the one-half interest transferred to her by that deed. It was, therefore, error to conclude in this instance that there was a resulting trust in favor of John A. Oldham.

The grounds upon which the trial court rests its decision as to the deed of 1879 have already been outlined by us and so need not be repeated here. The respondent contends that, even if the court is correct in certain of its deductions, the grounds stated in its rescript are insufficient to support the finding of a resulting trust. He further contends that there is material evidence leading to a contrary conclusion that the court failed to consider. We shall briefly examine both aspects of this contention, confining ourselves first to the main grounds set forth in the rescript of the trial court

and then to a consideration of the transcript of the evidence.

The statement in the rescript 'that by the deed of 1879 John A. Oldham would forfeit all "ownership and control" of the property is not correct. At the time of that convey-·ance he had two living children: Edgar and Joseph. Upon the death of their mother, Julia, these children would inherit her real estate subject to an estate by curtesy in the father in her entire property. Again, the motive or motives that actuated the transfer are open to speculation. Even though, as the trial justice believed, the property was transferred to the wife to put it beyond the reach of possible creditors, this fact alone did not prevent the beneficial interest in the property from passing to the wife under that deed. A conveyance in fraud of creditors is valid between the parties and voidable only by creditors. *Hudson* v. *White, supra.* Furthermore, were speculation as to motive permissible, it might be said that John A. Oldham conveyed his interest in the property out of love and affection for his incurably sick wife, in order to assure her that the property they had so far enjoyed in common would be preserved for her two children after her death.

Whether there was a sufficient delivery of the deed of 1879 is a question of fact to be determined not only from the immediate circumstances surrounding the transaction, but also from any other evidence in the case that tends to confirm or deny delivery at that time. There would be a sufficient delivery if the evidence, when considered as a whole, shows that on June 11, 1879, John A. Oldham intended that his deed should become presently operative and that his wife Julia was to become possessed of the estate. Although delivery is essential to the validity of a deed, no particular form of proceeding is required to effect it. A grantor could convey his property at common law without the grantee's knowledge, for the grantee, on acquiring such knowledge, could disclaim and repudiate the transaction, thereby revesting the title in the grantor. The question of whether or not there has been a delivery must, therefore, be

determined upon the facts of each particular case. Possession of the instrument is only a circumstance in the proof of delivery. Retention of the instrument by the grantor may be highly significant in one case and entirely irrelevant in another. The original intention of the grantor is the controlling element in all cases.

In the instant case, John A. Oldham gave a deed of his one-half interest in the property to a stranger, who in turn deeded it to Oldham's wife, Julia. Both warranty deeds were duly signed, sealed, acknowledged and recorded. We are not going to discuss, as some cases do, whether a presumption of delivery arises from any of these circumstances, but we do say that they constitute evidential facts tending to show that the then intention of John A. Oldham was to effect a delivery of the deed to Julia. His subsequent conduct in respect to the property clearly shows that he considered his full title therein as having passed by the deed to his wife. Less than three months after the transfer in question, Julia, by a deed "in her right" and in which the husband joined, mortgaged the property for $900 to Nancy W. Bowen. This act has a dual significance: it is an affirmation on the part of the husband that he intended a delivery of the deed of June 11, 1879, and it is an acceptance of that transfer by the wife, if she originally did not assent to or know of the transfer.

Another circumstance disclosed by the record that should be considered in this connection is that, in the deed of 1905, from John A. Oldham to this respondent, the grantor conveys a one-half interest in the property, which he describes as coming to him as the heir of his deceased son, Joseph. This description, although erroneous, is a recognition by John A. Oldham of the validity of the 1879 conveyance to his wife, for Joseph could only acquire title to a one-half interest in the property as the heir of his mother, Julia, provided Julia had acquired title to the property by the deeds from her husband of 1872 and 1879.

The facts and circumstances that we have just briefly

pointed out are not mentioned in the rescript of the trial justice and apparently they were not considered by him in reaching his conclusion in respect to the deed of 1879. Our examination of the entire record shows that a delivery of that deed is sufficiently established by the evidence in this case. We are, therefore, of the opinion that there was no resulting trust in favor of John A. Oldham under the deed of 1879.

The deed of 1905 from John A. Oldham to the respondent deserves consideration. Under our view of the facts, this property descended in equal shares to Edgar and Joseph when their mother, Julia, died intestate in 1879. Irrespective of the circumstances surrounding the execution of the deed of 1905, the question arises whether, in view of a peculiar provision in our statute of descent and distribution, any interest in this property descended to the father, John A. Oldham, as the heir at law of his deceased son, Joseph.

This question is controlled by general laws 1923, chap. 367, sections 1 and 6, which were the same in 1905. Section 1 provides that: "Whenever any person having title to any real estate of inheritance shall die intestate" and without children, "it shall descend and pass, excepting as provided in section six . . . to the parents in equal shares, or to the surviving parent of such intestate." Section 6 provides that: "When the title to any real estate of inheritance, as to which the person having such title shall die intestate, came by descent . . . from the parent . . . of the intestate, and such intestate die without children, such estate shall go, subject to the life estate and discretionary allowance provided by section four of this chapter, to the kin next to the intestate, of the blood of the person from whom such estate came or descended, if any there be." In construing sec. 6, this court has uniformly held that it includes only those who are the next of kin of the intestate of the blood of the person from whom the estate came by *immediate* descent. The authorities on this point are fully reviewed in *Arnold* v. *O'Connor*, 37 R. I. 557. See also *Morris* v. *Pot-*

*ter*, 10 R. I. 58. Although sec. 6 prescribes how an ancestral estate that came or descended from the parent to a person who dies intestate and without issue shall descend, it leaves the determination of who shall constitute "the kin next to the intestate", and the proportion in which they are to take the property, to the general canons of descent as set forth in the preceding sections of the statute. *Lewis* v. *Arnold*, 42 R. I. 94, 101.

In the instant case, this respondent alone is the next of kin of the blood of the person from whom the one-half interest in the property came to Joseph by *immediate* descent. That person was their mother, Julia. On the death of Joseph, this interest in the property that Joseph had inherited immediately from his mother passed to his brother, Edgar, and not to his father, John A. Oldham. It, therefore, follows that the deed from John to Edgar in 1905 had no validity in law under our statute of descent and distribution. Furthermore, if it were necessary for us to consider the circumstances under which this deed was procured by Edgar from his father, we would find from the evidence that the deed was a nullity because of Edgar's fraudulent conduct in connection therewith.

The complainants claim and the trial justice found that the $6000, which Edgar received for the wrongful death of his brother, Joseph, was subject to a constructive trust in favor of John A. Oldham, notwithstanding the assignment and release from John to Edgar in 1905. We agree with this conclusion. When the respondent, as administrator of the estate of Joseph, instituted proceedings against the railroad company to recover damages under our statute for the wrongful death of his brother, he acted throughout those proceedings only as trustee for the real beneficiary, his father, John A. Oldham. *Connor* v. *N .Y. N. H. & H. R. R. Co.*, 28 R. I. 560, 564. Edgar contends that by the assignment of August 2, 1905, and the release of October 25, 1905, his father made a gift to him of the $6000 which he had received from the railroad company. At the time that the as-

signment and the release were executed, John A. Oldham was sixty-eight years old and not in sound health, either physically or mentally. The testimony clearly shows that in this transaction, Edgar took undue advantage of the trust and confidence that his father reposed in him. Where real or personal property is transferred to a person standing in a confidential relation to the grantor, the burden is upon him to show affirmatively that the grantor acted with full knowledge and independently of the pressure of the relation.

This rule is especially applicable in cases of fiduciary relations where the transfer is voluntary or without adequate consideration and the grantor is dependent for advice or direction on the person who has assumed such relations. If the evidence fails to show a faithful discharge of his obligation by the fiduciary, but on the contrary, as in the case at bar, it establishes a clear breach of that obligation by the fiduciary for his personal gain, then a constructive trust will arise by operation of law. *Earle* v. *Chace*, 12 R. I. 374, 379. Speaking of the principle that controls in equity in such cases, this court, in *Hoppin* v. *Tobey*, 9 R. I. 42, at page 46, says: "Wherever confidence is reposed, the principle of the court requires that it shall be faithfully acted upon, and preserved from every degree of imposition, and the influence acquired kept free from any taint of selfish purposes, and restrained at all times to purposes of good faith and personal good." See also *Broadway Building Co.* v. *Salafia*, 47 R. I. 263; *Lyons* v. *Taylor*, 52 R. I. 305. In the instant case, the respondent can derive no advantage from the assignment or release upon which he relies to prove a gift to him of the $6000.

While we agree with the trial justice that this sum of $6000 is held by Edgar under a constructive trust originally in favor of his father, we cannot agree with him as to its distribution now. In his rescript he does not discuss or make any finding of fact respecting the settlement of February 20, 1923, between Amelia and Edgar Oldham. The final decree provides, however, that "said fund is held in

trust, one-half thereof for the heirs of John Oldham, namely:— the said Complainants, Clara A. Oldham and Chester Oldham, and the said Respondent, Edgar C. Oldham, share and share alike, and one half thereof for Amelia Oldham, or her heirs or assigns." Under these circumstances it is our duty to consider the scope and effect of the settlement of February 20, 1923, with a view of determining for ourselves whether "Amelia Oldham or her heirs or assigns" had any right to a one-half interest in the $6000.

When John A. Oldham died intestate in 1919, the statute of descent and distribution then in force (P. L. 1919, chap. 1787) provided that the *surplus* of the personal estate of a deceased person, not bequeathed, after the payment of his just debts, funeral charges and expenses of settling his estate, was to be distributed "one-half of said surplus to the widow . . . if the intestate died leaving issue", and the other one-half among the heirs of the intestate. The $6000 that Edgar held in trust for his father was a part of the father's personal estate and, as such, it was chargeable with the payments specified in the statute. If these payments were in fact made with the personal funds of any person or persons who are or were entitled to share in the $6000 as surplus of John A. Oldham's personal estate, then any and all such payments should be deducted from this principal sum before there can be a surplus for distribution within the meaning of the statute.

The respondent, without giving any particulars, contends that an accounting should be had between the parties, while the complainants deny that there is any need for such action. We cannot decide this point from the record before us as it fails to show whether any of the payments mentioned in the statute were made individually by the parties and by whom. An accounting is not necessary if the entire sum of $6000 is surplus or in case the parties themselves determine the actual surplus by making deductions for such payments, if any there are, from the principal sum of $6000; otherwise an accounting solely as to these matters is neces-

sary to fix the surplus of John A. Oldham's personal estate so that it may be distributed in accordance with the terms of the statute.

We will assume for convenience of discussion that the $6000 is surplus. Upon the death of John A. Oldham the statute gave one-half of this sum to his widow, Amelia, and the other half to his three children in equal shares. The testimony shows that both Amelia and her counsel knew that this sum of $6000 was claimed by or in behalf of John A. Oldham in the law action of 1908 and in the equity suit of 1915, and that these cases were two of the three suits pending against Edgar in the superior court at the time of his father's death. We have no doubt that upon the death of John A. Oldham counsel for Amelia knew that, if recovery were had in either of these two cases, one-half of the $6000 would go to Amelia as surplus of the personal estate of her deceased husband, and that he advised her accordingly. When, in 1923, Amelia agreed to settle all pending cases against Edgar in return for a deed from Edgar giving her an unencumbered life estate in the property, she and her counsel acted with the knowledge that they were settling cases in which she then had a substantial interest in her own right.

This settlement, which was carried out on February 20, 1923, was the result of prolonged and careful negotiations between counsel. It is clear to us from the testimony and the reasonable inferences therefrom that at that time, Amelia intended to settle and in fact did settle any and all claims that she then had against Edgar. It is of importance to note first, that the settlement stipulation filed in court in each of the two cases involving the $6000 was signed by Amelia personally, as well as by her attorney, at the request of counsel for Edgar; and second, that from the date of this settlement until her death in 1933, Amelia made no further claim in any capacity to the $6000. We are, therefore, of the opinion that after February 20, 1923, Amelia no longer had a right to one-half of the $6000 as surplus of her hus-

band's personal estate, and that Edgar, by reason of the settlement of that date in which he gave Amelia a substantial right in the real estate, is entitled to retain for himself the one-half of the $6000 that otherwise would have gone to Amelia. It follows that these complainants as heirs at law of their mother, Amelia, have no interest in one-half of the $6000 or whatever amount this principal sum may be reduced to by deductions as above stated. The remaining half of such principal sum shall be divided among these complainants and the respondent in equal shares.

The testimony shows that Edgar used $900 of the $6000 to discharge the mortgage on the real estate in order to give Amelia an unencumbered life estate. In view of our finding that the entire title to the real estate vested in him by descent from his mother and his brother, he can derive no advantage from a payment made by him for his own benefit with trust funds. The share of each complainant in the sum of $6000, or whatever other sum it may be reduced to by deductions, is unaffected by this payment.

Under the peculiar circumstances in this case, we cannot agree with the respondent's contention that the complainants are barred by laches from maintaining their bill. It is true that a long period of time elapsed between the death of the complainants' father in 1919, when the right first accrued to them to inquire into the matters now before us, and the bringing of this bill in December 1933. While lapse of time has an important bearing on the question of laches, yet in this case it is not sufficient in itself to bar the complainants. Since the decision in *Chase* v. *Chase,* 20 R. I. 202, this court has repeatedly held, as stated at pages 203 and 204 of that opinion, that "laches, in legal significance, is not mere delay, but delay that works a disadvantage to another. So long as parties are in the *same* condition, it matters little whether one presses a right promptly or slowly, within limits allowed by law." (italics ours) *Tanner* v. *Whitney,* 52 R. I. 391; *Hatton* v. *Howard Braiding Co.,* 47 R. I. 47; *Stephens* v. *Dubois,* 31 R. I. 138; *Williams* v. *Starkweather,* 24 R. I. 512.

The testimony in the instant case shows that before 1923 the rights of these complainants in the real estate and in the $6000 were involved, at least indirectly, in pending litigation against Edgar, which, if determined in a certain way, would have enured to their benefit without recourse to litigation by them. Following the settlement of February 20, 1923, between Amelia and Edgar, the complainants continued to live with their mother until her death on the property that Edgar deeded to the mother for life. It is reasonable to infer that the complainants refrained from taking any action against Edgar in their own right during this period for their mother's sake. Edgar was in no way prejudiced by their inaction. Both parties remained in the same condition until Edgar instituted trespass and ejectment proceedings against the complainants, when they immediately brought this bill. Under these circumstances we see no reason for barring them on the ground of laches.

We are confronted with an entirely different situation when we come to consider the question of interest on the share of the $6000 that is ultimately determined as due to the complainants. The trial justice makes no mention of interest in his rescript, but the final decree in this case allows interest from 1905 to the date of payment by Edgar on the entire sum of $6000, minus the $900 paid by Edgar to discharge the mortgage on the real estate, which the decree orders reconveyed to the complainants. The amount of the share to which the complainants may be entitled to as surplus of their father's estate and upon which the interest must be figured is still unascertained. Until this amount is fixed upon evidence in an accounting or by agreement of the parties, the complainants' share of surplus upon which interest would be chargeable remains unliquidated and can furnish no proper basis for the computing of interest. Furthermore, the complainants, for reasons of their own, made no demand for the determination of their rights in this fund of $6000 until they filed this bill on December 20, 1933. Generally speaking, the recovery of interest in this class of

cases must frequently depend upon the justice and equity of the particular case. Under the existing circumstances in this case, we are of the opinion that the complainants are equitably entitled to recover interest only from the date of their bill. See recent opinion in *Huff* v. *Knight,* 58 R. I. 257. See also *Bright* v. *Wilcox,* 42 R. I. 404.

In order that hereafter the matters litigated in this bill may be closed as speedily as possible, we deem it advisable to state now that under the circumstances in this case the respondent is not entitled to any compensation from these complainants for use and occupation of the real estate.

The appeal of the respondent is sustained, and the decree appealed from is reversed in part.

On June 23, 1937, the parties may present to this court a form of decree in accordance with this opinion to be entered in the superior court.

*Knauer & Fowler, Philip S. Knauer, Jr.,* for complainants.
*Roscoe M. Dexter, Henry E. Crowe,* for respondent.