Mary NOTARANTONIO

v.

James A. NOTARANTONIO et al.

No. 2006–121–Appeal.

Supreme Court of Rhode Island.

Jan. 18, 2008.

John D. Deacon, Jr., Esq., Providence, for Plaintiff.

Karen A. Pelczarski, Esq., Providence, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

**OPINION**

Justice SUTTELL, for the Court.

The plaintiffs, Carolyn M. DelFarno and Beverly Forte,[1] appeal from a January 5, 2006 judgment in favor of the defendants, James A. Notarantonio, Susan Antonio, and Lisa Notarantonio[2] in this dispute over gifts of stock in a family business and real estate. After a nonjury trial, the trial justice entered a judgment in favor of the defendants concerning all claims against them, with the exception of a judgment for the plaintiffs rescinding the transfer of seventeen shares of stock in JGF Realty, Inc. and awarding them the sum of $4,539

for distributions attributable to those shares. The defendant, James A. Notarantonio, has filed a cross-appeal challenging the rescission and monetary award. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court in all respects.

**I**

**Facts and Procedural History**

The trial justice quoted Shakespeare to characterize the family dispute that engendered this lawsuit: "How sharper than a serpent's tooth it is to have a thankless child."[3] Regrettably, it is apparent that this once close-knit family has become irreparably fractured in a way that judicial opinions are not likely to repair.

**A. Background**

Mary Notarantonio and her husband, Fred, lived in North Providence, Rhode Island. They had three children, a son, James, and two daughters, Carolyn and Beverly.[4] Adjacent to the family home was an automobile dealership, Notarantonio Brothers Ford, a dealership which Fred owned with his two brothers, Joe and Guy. Each brother owned one-third of the stock in the corporation that operated the dealership, Notarantonio Brothers, Inc. (Notarantonio Brothers). The brothers also owned a separate corporation, JGF Realty, Inc. (JGF), which owned the land on which the Ford dealership was located. Notarantonio Brothers Ford leased from JGF the land upon which the dealership operated.

---

1. The original plaintiff, Mary Notarantonio, died in July 2006. The Supreme Court substituted her executrices, Carolyn M. DelFarno and Beverly Forte for Mary Notarantonio on February 15, 2007.

2. Susan Antonio and Lisa Notarantonio are daughters of James Notarantonio.

3. William Shakespeare, *King Lear*, act 1, sc. 4.

4. The Court will use first names in this opinion to avoid confusion. No disrespect to any of the parties is intended.

In or about 1957, Mary, Fred, and James acquired as joint tenants a summer home in Jamestown, Rhode Island. Later, in 1962 and 1964, Fred and Mary, as joint tenants, received conveyance of two unimproved beachfront parcels in Jamestown. Additionally, the couple owned a vacation home in Pompano Beach, Florida, and a rental property in North Providence, Rhode Island.

The trial justice concluded that, with respect to financial matters, Fred and Mary clearly favored James over their daughters. Not only did they place James's name on the deed as a joint tenant in their Jamestown summer residence, but also they bought James an unimproved lot upon which to build a home when he was married. Fred and Mary also gave James $100,000 to start a business. In 1968, Fred gave James eight of his thirty-three and one-third shares of Notarantonio Brothers stock; James later became an officer and director of the corporation. In addition, Fred's estate plan left all his assets to Mary; but it indicated that if she should predecease him, then the stock in the family businesses and real estate would pass to James.

After Fred's death in 1982, Mary continued to be very generous to James, and they enjoyed a close relationship. They lived together for much of the time in North Providence and spent time together in both Jamestown and Pompano Beach. Mary also executed a will and a pour-over trust, which left all her stock and real property to James.

In 1985, Notarantonio Brothers ceased operating the Ford dealership, and JGF subleased the land to Rizzo Ford. Also around this time, Mary sold a parcel of land adjacent to the Ford dealership to JGF through an installment agreement. Mary received a check each month from this sale. It was also during this time

period that James was indicted, convicted, and incarcerated for having made false statements in connection with programs involving federal money. In addition, he was indebted to the Internal Revenue Service, which had placed a lien on his assets. Mary eventually paid the IRS approximately $100,000 to release the lien.

During the late 1980s and early 1990s, Notarantonio Brothers began to declare dividends for its shareholders. Mary, who owned only twenty-five and one-third shares of Notarantonio Brothers stock, received both her share and James's share of the dividends, part of which she spent for James's benefit. The trial justice characterized the foregoing as a scheme to hide James's assets from the IRS.

It is at this point that plaintiffs' and defendants' versions of events began to differ considerably.

### B. Plaintiffs' Testimony

The plaintiffs' version of the events is as follows. After Fred's death in 1982, Mary contended that James began to badger her about transferring title to the Jamestown properties to him. After his release from prison in 1988, he became increasingly insistent and forceful until she finally and angrily relented when she was in a "weakened and sickly condition." Thus, in 1994, she transferred the Jamestown summer home and one of the unimproved lots to James. She did retain, however, the second lot, which she later sold for $48,000.

In September 1994, Mary underwent open-heart surgery. She testified that when she returned home after her surgery Richard Foley, the bookkeeper for Notarantonio Brothers and JGF, paid her an unexpected visit. Mr. Foley placed papers in front of Mary for her signature and began to speak to her about the businesses. James then came into Mary's home and interrupted the conversation.

According to Mary, James told her "[t]he business is not a business." James's statement about the companies confused Mary because she believed that the company was always a business. James told Mary "[w]ell things had to be put together" to ease her confusion about the state of the businesses. Mr. Foley assured Mary that she would "still get [her] money" if she signed the documents, which, she testified, she believed meant she would still get her monthly dividend check from Notarantonio Brothers, Inc. Mary said she signed the documents that Mr. Foley had given her without reading them and without anyone reading the documents to her. Mr. Foley did not leave Mary a copy of the documents she had signed.

Later, Mary and James's relationship began to deteriorate. Mary discovered that James had started to look for property in the Florida Keys. Mary testified she was hurt that James did not tell her about his plans to buy property in Florida. In addition, one time when Mary went to the Jamestown vacation home to visit James, James left for the beach and did not offer Mary any food or drink. The lack of food and drink made Mary lightheaded and she required hospitalization. Mary also contended that James continually told her "everything belonged to him."

Mary further testified that one day James used an epithet in reference to his late father. James's statement upset Mary greatly, so she called her daughter, Carolyn. Carolyn came to Mary's house immediately to comfort her. Mary told Carolyn that James had been telling her repeatedly that everything Fred had left when he died belonged to James. In an effort to calm her mother, Carolyn read Fred's will to Mary to show Mary that she did own all her late husband's property. Mary then told Carolyn that she had signed some papers that Mr. Foley had brought to her, but Mary said she did not know the content of the papers she had signed. Carolyn called Mr. Foley and asked him to bring Mary copies of the documents.

Several days later, Mr. Foley brought the papers Mary had signed shortly after her open-heart surgery to Mary's home in the presence of both Carolyn and Beverly. Mr. Foley brought three separate stock-transfer documents and two deeds. The three stock-transfer documents each had different dates: December 22, 1993, May 16, 1994, and January 2, 1995. Both deeds were dated September 27, 1994.

When Mr. Foley presented Mary with the papers, she said she did not recall signing them and was unaware of the contents of the documents. Carolyn and Beverly asked Mr. Foley why he had not read the documents to Mary before she signed them. Mr. Foley said that he did not have time to read Mary the documents because James suddenly came into Mary's house. Mr. Foley allegedly stated to Carolyn and Beverly that James "could have had it all, but he didn't want to wait." During Mr. Foley's visit, Carolyn and Beverly noticed that a signature on the stock-transfer document dated January 2, 1995 that purportedly transferred seventeen shares of JGF stock to James did not look like Mary's signature.

Several weeks later Mary asked to see an attorney. Mary said she wanted to see an attorney because she realized she was not receiving her stock dividends as Mr. Foley had told her she would. Mary said she decided to wait to file suit, however, because she hoped that James would change his mind and feared that a lawsuit would hurt his daughter Susan's law school graduation and legal career.

## C. Defendants' Testimony

James, Susan, and Lisa offered a different version of some key events. Susan

testified that Mary was anxious to transfer her assets to James and was frustrated that she had to wait to make any transfer until James settled his debt with the IRS. James said that after Mary's open-heart surgery Mary told him to "[g]o get everything squared away" concerning her estate planning. Mary told James to leave her with three pieces of property: one unimproved lot in Jamestown, the rental home in North Providence, and the vacation home in Pompano Beach, Florida. According to James, Mary then told him to finalize the transfers before she left to recover from the surgery in Florida. James then made the decision to transfer a portion of the stock to his two daughters, Lisa and Susan, instead of transferring all of Mary's stock to himself as a way of keeping his own estate planning in order.

Once Mary came home from the hospital, she gave James all of her papers pertaining to the Jamestown properties and stocks. James then asked Mr. Foley to bring the stock-transfer documents to Mary. James said that Mary signed all the stock-transfer documents at one time and not over three years.

After Mary transferred the stocks, James asked Lisa and Susan to meet him at the JGF offices. James told Susan and Lisa that Mary was transferring her shares in Notarantonio Brothers to both of them. Then James asked Susan and Lisa to thank their grandmother for the gift. Susan and Lisa immediately walked into Mary's home and said, "Thank you, grandma" to which Mary replied, "Good luck and God bless."

### D. Trial Justice's Decision

The trial justice did not completely accept either party's scenario of events. In general, the trial justice found that Mary filed this lawsuit because James had hurt her feelings, not because James had taken advantage of her. The trial justice found that Mary understood James's financial situation with the IRS and was a willing participant in hiding James's assets from the IRS. Mary also wanted James to resolve his situation with the IRS so she could transfer her stock in the family business to him during her lifetime. The court also found that Mary wanted to transfer the Jamestown vacation home to James, but waited until his IRS lien was resolved.

Notwithstanding Mary's contention that she did not know she was the sole beneficiary of her husband's estate, the trial justice found that Mary knew she owned stock in the family companies and understood that she had an ownership interest in the property in Jamestown. Furthermore, the trial justice rejected Mary's assertion that she was harassed into making the transfer of the Jamestown property because Mary insisted on keeping an unimproved lot for herself. The trial justice stated that if James had bullied Mary into transferring the Jamestown property to James, she would have given all the property to him instead of keeping a lot to herself.

The trial justice found, however, that the stock-transfer documents had been backdated. In reaching this conclusion, the trial justice found that Mary signed all the stock-transfer documents on the same day. Since all the stock-transfer documents had different dates, the trial justice found that Mr. Foley had backdated the documents in an attempt to relieve Mary of gift-tax liability, a practice that she characterized as consistent with his lack of "professional responsibility or ethics." Nevertheless, the trial justice found that the backdating of the documents did not void the transfer because Mary was aware of what she was signing and understood the nature of the documents. Additionally, the trial justice found that Mary signed all the stock-transfer documents, except the one dated Janu-

ary 1995, "willingly, voluntarily, without undue pressure having been asserted on her by anyone." Mary had donative intent to create gifts and she effectively delivered them, thereby creating valid *inter vivos* gifts. The trial justice further found, however, that Mary's signature on the stock-transfer document dated January 2, 1995, transferring seventeen shares of JGF stock to James, was forged.

Accordingly, the trial justice found for Susan and Lisa on all claims against them and for James on all claims, except for the seventeen shares of JGF stock transferred by the forged document. The court entered judgment for Mary for rescission of the transfer of seventeen shares of JGF stock and for $4,539, which represents the amount of distributions James received as owner of those seventeen shares of JGF stock. The plaintiffs timely filed a notice of appeal, and James has cross-appealed.

### E. Issues on Appeal

The plaintiffs contend the trial justice erred as follows: (1) by failing to address their claim of breach of fiduciary duty; (2) by failing to make any findings of fact or conclusions of law with respect to their claim of misrepresentation; (3) by overlooking and misconceiving material evidence; (4) by holding that defendants carried their burden of proof; (5) by excluding from evidence a statement made by James Notarantonio in his deposition; and (6) by awarding costs to defendants and denying costs to plaintiffs. Additionally, defendant James Notarantonio cross-appeals asserting the trial justice erred by ordering a rescission of Mary's purported transfer of seventeen shares of JGF stock.

## II

### Standard of Review

■ It is well settled that "[t]his Court will not disturb the findings of a trial justice sitting without a jury unless such findings are clearly erroneous or unless the trial justice misconceived or overlooked material evidence * * *." *Haydon v. Stamas*, 900 A.2d 1104, 1113 (R.I.2006) (quoting *Imperial Casualty and Indemnity Co. v. Bellini*, 888 A.2d 957, 961 (R.I. 2005)). "[I]f, on review, the record indicates that competent evidence supports the trial justices findings, we shall not substitute our view of the evidence for his [or hers] even though a contrary conclusion could have been reached." *Bellini*, 888 A.2d at 961 (quoting *Nisenzon v. Sadowski*, 689 A.2d 1037, 1042 (R.I.1997)).

## III

### A. Breach of Fiduciary Duty

■ The plaintiffs first argue that the trial justice committed reversible error by failing to make specific findings of fact and conclusions of law, as required by Rule 52(a) of the Superior Court Rules of Civil Procedure. They contend that when a purported *inter vivos* gift is challenged by the donor, the donee bears a heavy burden of proving the validity of the gift, even more so when the donee stands in a fiduciary or confidential relationship to the donor. In such cases, plaintiffs say, the fiduciary must establish by clear and convincing evidence that he or she acted with the utmost candor, fairness, and good faith.

■ This Court has "recognized that '[a] trial justice's analysis of the evidence and findings in the bench trial context need not be exhaustive, [and] if the decision reasonably indicates that [she] exercised [her] independent judgment in passing on the weight of the testimony and the credibility of the witnesses it will not be disturbed on appeal unless it is clearly wrong or other-

wise incorrect as a matter of law.'" *McBurney v. Roszkowski,* 875 A.2d 428, 436 (R.I.2005) (quoting *V. George Rustigian Rugs, Inc. v. Renaissance Gallery, Inc.,* 853 A.2d 1220, 1225 (R.I.2004)).

In this case, plaintiffs assert that James owed Mary a fiduciary duty in five discrete capacities: (1) as a director of each of the two corporations, (2) as an officer of the two corporations, (3) as a representative of Mary's interests as a shareholder at all corporate business meetings, (4) as the recipient of Mary's power of attorney to represent her interests in the business, and (5) as a person in a family relationship involving one who is elderly and vulnerable. In addition, plaintiffs argue that James is not relieved of his fiduciary responsibilities by the fact that some of the alleged misconduct was committed by Mr. Foley rather than by James directly. The plaintiffs assert that the trial justice's failure to make findings with respect to their claim of breach of fiduciary duty requires reversal.

 This Court has recognized that a "fiduciary obligation, similar to that imposed upon partners in a partnership, does exist among the shareholders in a small family type of or close corporation." *A. Teixeira & Co. v. Teixeira,* 699 A.2d 1383, 1387, 1388 (R.I.1997) (concluding that a fiduciary duty existed on the "basis of the small number of shareholders in plaintiff corporation, the active participation by these shareholders in management decisions, and their close and intimate working relations"). If a fiduciary duty is found, such duty "is one of trust and confidence and imposes the duty on the fiduciary to act with the utmost good faith." *Hendrick v. Hendrick,* 755 A.2d 784, 789 (R.I.2000) (quoting *Point Trap Co. v. Manchester,* 98 R.I. 49, 54, 199 A.2d 592, 596 (1964)). Not all close corporations or family-type corporations give rise to a fiduciary duty, how-

ever, and finding a fiduciary duty in these corporate situations can occur only after a fact-intensive inquiry. *A. Teixeira Co.,* 699 A.2d at 1387.

We carefully have reviewed the trial justices bench decision and are satisfied that she adequately resolved the issues raised by plaintiffs complaint. Although she did not specifically address the claim of breach of fiduciary duty, her findings of fact for all intents and purposes preclude a finding that James breached any such duty. The trial justice articulated her central finding at the very beginning of her bench decision: the controversy that engendered the "lawsuit developed not over undue influence, but the controversy developed over hurt feelings." Although noting the "special relationship" between James and Mary, the trial justice found that "James slighted his mother on more than one occasion" and "these slights prompted this lawsuit."

The trial justice went on to say that although Mary and her husband loved their children equally, they did not treat them equally with respect to the disposition of assets, finding that they clearly favored James "when it came to how they intended to dispose of their assets." She noted that both Mary and Fred had executed wills leaving (upon the death of the survivor) the bulk of their estates to James to the exclusion of his sisters. They also had added James to the title of their Jamestown summer home as a joint tenant.

The trial justice described Mary as "a strong woman. She controlled her own life. She was no pushover." She specifically found that Mary willingly participated in a scheme to hide James's assets from the government during the period that James owed money to the IRS. Mary received the monthly corporate dividend that James was entitled to receive, and

then she spent the money for James's benefit. According to the trial justice, this demonstrated that Mary "appreciated her sons financial situation," *i.e.*, that James could not receive property until he had settled with the IRS.

Significantly, the trial justice credited the testimony of Susan Antonio that Mary "was anxious to transfer property to James and was frustrated in that desire by the fact that he could not own property in his name while the IRS had claims against him," and that "Mary wanted to dispose of her assets during her lifetime." The court also accepted defendants contention that Mary would have transferred her shares of stock and Jamestown real estate to James sooner were it not for the outstanding judgment against him and his indebtedness to the IRS.

In short, the findings of the trial justice belie the scenario of an unsophisticated and vulnerable elderly woman being taken advantage of by an unscrupulous son. On the contrary, the trial justice painted a picture of a strong woman, well aware of her assets and with a clear purpose to transfer certain of those assets during her lifetime to her son and not to her daughters. Moreover, she was so frustrated in this purpose by her sons obligation to the IRS that she took it upon herself to satisfy the IRS lien so that she could accomplish her donative desires.

When viewed in the light of these findings, to which this Court accords great weight, it is clear there was no breach of a fiduciary duty. The trial justice rejected Mary's testimony that she transferred the Jamestown property to James because she was tired of his nagging her about it. With respect to the stock transfers, the trial justice specifically found that Mary "intended to transfer shares in the family business to James once he settled his indebtedness with the government" and that

Richard Foley "assisted with those transfers."

The trial justices decision leaves no doubt about the implications of her findings. Mary was not defrauded, cajoled, or pressured into transferring the stock and real estate to James in any manner. Rather, Mary emerges as an intelligent, strong-willed woman who had demonstrated over a number of years an intent to dispose of her assets disproportionately to her son. Further, she had clearly expressed an intention to make such dispositions during her lifetime and, in fact, did so as soon as the impediment of the IRS indebtedness was removed.

The trial justices findings preclude any breach of fiduciary duty by James. Clearly, there can be no fiduciary duty arising out of the instant family relationship because Mary was not seen by the trial justice to be "vulnerable, lacking in business capacity, and/or dependent for advice and information" as plaintiffs suggest. *See Simpson v. Dailey*, 496 A.2d 126, 128–29 (R.I.1985); *Oldham v. Oldham*, 58 R.I. 268, 281, 192 A. 758, 765 (1937).

In this case there simply is no room in the trial justices decision upon which the claim of breach of fiduciary duty may find purchase. The transfers at issue were consistent with both Mary's long-standing estate planning desires and her express intent to dispose of her assets during her lifetime. As unusual or unfair her wish to favor her son over her two daughters may seem in retrospect, we discern no legitimate cause to disturb the trial justices determinations of credibility and findings of fact.

### B. Misrepresentation, Undue Influence, and Duress

The plaintiffs also argue that the trial justice erred by failing to find misrepresentation, undue influence, and duress in

the transfer of the stock shares and land. The plaintiffs' brief cites eighteen alleged errors in the trial justice's findings of fact relating to the claims of misrepresentation, undue influence, and duress. As previously stated, this Court will not reverse the factual findings of a trial justice sitting without a jury unless the findings clearly are erroneous or unless she overlooked or misconceived evidence. *Haydon*, 900 A.2d at 1113.

▆▆▆▆ Concerning the claim of undue influence and duress, this Court has defined undue influence as the "substitution of the will of [the dominant] party for the free will and choice [of the subservient party]." *Filippi v. Filippi*, 818 A.2d 608, 630 (R.I.2003) (quoting *Tinney v. Tinney*, 770 A.2d 420, 437–38 (R.I.2001)); *Caranci v. Howard*, 708 A.2d 1321, 1324 (R.I.1998). "In determining what constitutes undue influence in a particular case, then, a trial justice ordinarily examines the totality of circumstances, including the relationship between the parties, the physical and mental condition of the grantor, the opportunity and disposition of a person wielding influence, and his or her acts and declarations." *Filippi*, 818 A.2d at 630 (quoting *Tinney*, 770 A.2d at 438). Duress similarly has been defined as "a condition of mind produced by improper external pressure or influence that practically destroys the free agency of a party and causes the person to do an act * * * not of his or her own volition." 25 Am.Jur.2d *Duress* § 1 at 446 (2004).

The trial justice found that neither undue influence nor duress was present in this case. The trial justice found that James did not substitute his will for Mary's free will and choice during these donative transfers. The trial justice noted the fact that Mary kept an unimproved Jamestown lot for herself, which she later sold, demonstrated Mary's knowledge of

assets and her intelligence. The trial justice also found that Mary intended to transfer stock to James once his indebtedness to the federal government was settled. The trial justice stated that Mary was a strong-willed woman who was not vulnerable to James's influence, and that Mary "transferred her property to James and his daughters as a result of her own free will and choice." Finally, the trial justice found that this disposition of property was natural given the relationship at the time between James and Mary.

▆▆▆ The plaintiffs aver that the trial justice failed to make "findings regarding what was said and/or not said, whether statements were true, whether there were material nondisclosures, belief by the plaintiff, and reliance." We reject the suggestion that a trial justice must resolve every disputed factual contention that may arise during a trial. A trial justice need not "categorically accept or reject each piece of evidence in his decision for this Court to uphold it because implicit in the trial justices decision are sufficient findings of fact to support his rulings." *Narragansett Electric Co. v. Carbone*, 898 A.2d 87, 102 (R.I.2006); *see also Mattera v. Mattera*, 669 A.2d 538, 541 (R.I.1996) ("This Court has held that even in the event that 'a trial justice fails to expressly articulate findings of fact we shall not refuse to accord the decision the persuasive force usually accorded such decisions on review, for the reason that implicit in a decision are such findings of fact necessary to support it.' ") (quoting *Duke v. Duke*, 510 A.2d 430, 432 (R.I.), *cert. denied*, 479 U.S. 864, 107 S.Ct. 219, 93 L.Ed.2d 147 (1986)).

Here, the trial justice expressly found that Mary signed the stock-transfer documents "willingly, voluntarily, without undue pressure having been asserted on her by anyone." Moreover, she did not accept

Mary's "version of the circumstances surrounding the transfer of the Jamestown property to James[,]" finding rather that "once the relationship with her son broke down, Mary wanted to believe that she was forced into a transfer of the Jamestown property and the stock in the family business to James; but that doesn't make it so." The trial justice concluded:

> "The evidence is clear, the evidence is convincing. To sustain the claim of undue influence, the Court would have to find that James substituted his will for [Mary's] free will and choice. With respect to these donative transfers, the evidence suggests otherwise. [Mary] transferred her property to James and his daughters as a result of her own free will and choice. [Mary] is a strong-willed woman. She was not vulnerable to be being influenced by [James]. In spite of their close relationship, she had her own ideas and was not afraid to assert them. James may have enjoyed a relationship of trust and confidence with his mother, but he was her son. This is not a situation where the deeds constitute unexplained, unnatural disposition of her property to a stranger. Transferring the property to James was not the least bit unexpected or unnatural under the circumstances of her relationship with her family, the history among them, her wealth, and her age.

> "With respect to the claims of duress, there is no evidence that James threatened to perform or did perform any wrongful act that coerced her into making the donative transfers that she would not have otherwise made. The only acts he purportedly performed to coerce her into transferring her interest in the Jamestown property was in the form of nagging. The Court didn't accept that testimony; but if he had nagged her, [Mary] is sufficiently strong to withstand the nagging as she proved

by retaining a parcel that she sold for $48,000. There's no evidence that anyone misrepresented anything to [Mary]. She knew exactly what she was doing when she signed the documents. No one attempted to mislead her; and there was no misrepresentation."

The import of the trial justice's findings is unmistakable. She assessed the veracity of the various witnesses, weighed the credible evidence, drew reasonable inferences from the evidence, made extensive findings of fact, discussed her findings and theory of the case at some length, and categorically rejected any allegation that Mary transferred the stock and real estate to James as the result of misrepresentation, undue influence or duress. We are satisfied that her findings are sufficient to support her legal conclusions, even though she may not have articulated specific findings with respect to each and every disputed fact. Moreover, we perceive no merit in plaintiff's contentions that the trial justice overlooked or misconceived material evidence, particularly in the context of this bench trial.

## C. Burden of Proof

Each party asserts that the other bore the burden of proving the validity *vel non* of Mary's purported gifts of stock and real estate to James. The plaintiffs argue that in cases of contested *inter vivos* gifts the burden of proof rests with the donee to show the requisite donative intent; and, further, they contend that the donee's burden is substantially higher when the donor and donee are in a relationship of trust and confidence. The defendants contend, on the other hand, that as in any civil action the burden of persuasion remains on plaintiffs as the party contesting the validity of a donative transfer. They further assert that even if a fiduciary relationship were established, such as to warrant a

presumption of undue influence, the effect would be to shift the burden of going forward with the evidence, but not the burden of persuasion.

The trial justice did not directly rule upon whom the burden of proof vested. She stated, however, "even if the defendant has the burden of proof by clear and convincing evidence, the defendant would have met that burden. The evidence is clear, the evidence is convincing."[5] We perceive no error in the trial justice's resolution of this issue.

### D. Evidentiary Ruling

 The plaintiffs also contend that the trial justice committed prejudicial error by excluding from evidence a statement James made at his deposition. The trial justice sustained an objection to the following question and excluded its corresponding answer:

"Q. After your mother's heart attack and heart operation and after she got back from the hospital and you went to work on causing a transfer of the stock on the two corporations and the Jamestown property, did you have any conversations with her explaining to her the nature of the businesses?

" * * *

"A. I don't remember. She never was interested in the businesses, so why would I try to explain it? All these years she never knew anything about the business, so I never tried to explain

it to her because I handled everything myself."

"It is well established that 'the admissibility of evidence is within the sound discretion of the trial justice, and this Court will not interfere with the trial justices decision unless a clear abuse of that discretion is apparent.' " *DiPetrillo v. Dow Chemical Co.,* 729 A.2d 677, 690 (R.I.1999) (quoting *Soares v. Nationwide Mutual Fire Insurance Co.,* 692 A.2d 701, 701–02 (R.I.1997) (mem.)). The trial justice sustained the objection, stating that there was no foundation that James "went to work to do it." After reviewing James's testimony, we are hard-pressed to ascribe abuse of discretion to the trial justices ruling. Moreover, as plaintiffs acknowledge in their brief, James did testify to the following question:

"Q: When you were doing the transfer of J–G–F shares from your mother in the early 1990s, did you ever review with her the value given to the property by the town of North Providence for tax purposes, the J–G–F Realty property?
"A: I dont ever remember reviewing anything about the business with my mother because she was never interested in it. My mother did not know what was going on in the company or the business or how it was run. It was all mens affair at the time. I mean, she could tell you that, if she wants to tell you the truth."

Thus, at best the excluded testimony was cumulative. We are satisfied that the trial justice did not clearly abuse her discretion

---

**5.** For a discussion of varying degrees of burden of proof and specifically the clear and convincing evidence burden, *see Parker v. Parker,* 103 R.I. 435, 442, 238 A.2d 57, 60–61 (1968) ("The phrase 'clear and convincing evidence' is more than a mere exercise in semantics. It is a degree of proof different from a satisfaction by a 'preponderance of the evidence' which is the recognized burden in civil actions and from proof 'beyond a reason-

able doubt' which is the required burden in criminal suits. If we could erect a graduated scale which measured the comparative degrees of proof, the 'preponderance' burden would be at the lowest extreme of our scale; 'beyond a reasonable doubt' would be situated at the highest point; and somewhere in between the two extremes would be 'clear and convincing evidence.' ").

by excluding the statement from James's deposition. Therefore, this Court will not disturb the trial justices ruling on appeal.

### E. Award of Costs

 Finally, plaintiffs argue that the trial justice erred in denying costs to plaintiffs and awarding costs to defendants. However, plaintiffs have not provided this Court with a sufficient record to address this concern on appeal. We are unable to locate in the record any order relative to an award of costs. It is the responsibility of the appellant to provide this Court with the appropriate record, transcripts, and orders to provide meaningful review on appeal. This Court consistently has stated "that an incomplete record on appeal precludes any meaningful review by this Court." *Riley v. Stone,* 900 A.2d 1087, 1094 (R.I.2006) (citing *State v. Pineda,* 712 A.2d 858, 860 (R.I.1998)). When the appellants have failed to provide this Court with the trial justice's order from which they appeal, proper appellate review is impossible. *Riley,* 900 A.2d at 1094. Therefore, we will not disturb the ruling of the trial justice.[6]

### IV

### James Notarantonio's Cross–Appeal

 James cross-appeals from that portion of the judgment entered in favor of plaintiffs for rescission and return of the seventeen shares of JGF stock dated January 2, 1995, and for the $4,539, which represents the distribution James received with respect to those shares. James argues on appeal that it is impossible to reconcile the trial justice's rescission award with her "many factual findings which belied rescission." James points out that the trial justice rejected much of Mary's testimony and made not a single finding of wrongful conduct on his part. He asserts, therefore, that in awarding rescission the trial justice "failed to analyze the equities, and clearly failed to do justice between the parties."

With respect to the purported January 1995 transfer of the seventeen shares of JGF stock, the trial justice accepted the testimony of Mary's daughters that the signature on the document was not Mary's. The trial justice also found credible the testimony of a handwriting expert who opined that Mary's signature on the document was not genuine. Additionally, the trial justice noted that Mr. Foley testified at trial that he had not witnessed Mary sign the document.

 The two requisite elements of a valid *inter vivos* gift are " 'a present true donative intent' and 'some manifestation such as an actual or symbolic delivery of the subject of the gift so as to completely divest the donor of dominion and control of it.' " *Dellagrotta v. Dellagrotta,* 873 A.2d 101, 110 (R.I.2005) (quoting *Black v. Wiesner,* 112 R.I. 261, 267, 308 A.2d 511, 515 (1973)). Here, the trial justice's findings that Mary did not sign the operative transfer document negates both the present donative intent and the actual or symbolic

**6.** Even if the issue of costs were properly before us, we are satisfied that the trial justice did not abuse her discretion. From the transcript of the hearing, we can discern that she reviewed the numerous depositions that were taken and ordered payment for some that she deemed "necessary or reasonably necessary," but not for others that she considered to be excessive. She noted in general that "there was a certain lack of cooperation and civility that accompanied the preparation of this matter for trial that made it a more lengthy process than necessary." She also said that "this case was overly prepared, excessively prepared, abusively prepared." The trial justice ultimately concluded that Susan would get 100 percent of the costs she had sought, Lisa would get 50 percent, and James and Mary would get nothing.

delivery of the shares. Accordingly, we perceive no error in the trial justice's ruling.

## V

### Conclusion

For the foregoing reasons, the judgment is affirmed in all respects, and the papers are remanded to the Superior Court.